UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KAYLA MARIE COLE and )
TERESA L. GORDON, )
　 )
　　　　Plaintiffs, )
　 )
　　　　v. )　　　1:17-cv-00071-JAW
　 )
STATE OF MAINE, OFFICE OF )
INFORMATION TECHNOLOGY, )
　 )
　　　　Defendant. )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Two former employees allege that their state-agency employer harassed, discriminated, and retaliated against them in violation of the Maine Whistleblowers' Protection Act, Title VII, and the Maine Human Rights Act. Concluding that there are genuine issues of material fact regarding the claims of retaliation under the Maine Whistleblowers' Protection Act, Title VII and the Maine Human Rights Act and regarding the hostile work environment claims under Title VII and the Maine Human Rights Act, the Court denies the state agency's motion for summary judgment on those claims, but the Court grants summary judgment on the disparate treatment theory underlying the Title VII and Maine Human Rights Act sex discrimination claims.

## I.　　PROCEDURAL HISTORY

On February 23, 2017, Kayla Marie Cole and Teresa L. Gordon filed suit in this Court against the state of Maine Office of Information Technology (OIT), alleging that the OIT, their former employer, violated the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e, *et seq,* (Title VII), the Maine Human Rights Act, 5 M.R.S. §§ 4551 *et seq.* (MHRA), and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831, *et seq.* (WPA). *Compl.* (ECF No. 1). OIT answered the Complaint on May 19, 2017, denying its essential allegations and raising affirmative defenses. *Answer to Compl.* (ECF No. 5). On August 11, 2017, OIT filed an Amended Answer. *Am. Answer to Compl.* (ECF No. 11).

On December 21, 2017, OIT filed a motion for summary judgment and a statement of material facts. *Def.'s Redacted Mot. for Summ. J.* (ECF No. 27) (*Def.'s Mot.*); *Def.'s Redacted Statement of Fact* (ECF No. 28) (DSMF). On February 9, 2018, Ms. Cole and Ms. Gordon filed a response, opposing the motion, together with an opposing statement of material facts with a statement of additional material facts. *Pls.' Resp. to Def.'s Mot. for Summ. J.* (ECF No. 38) (*Pls.' Resp.*); *Pls.' Opposing Statement of Material Fact and Additional Facts* (ECF No. 39) (PRDSMF; PSAMF). On March 7, 2018, OIT filed a reply to the Plaintiffs' response with a reply to Plaintiffs' statement of material facts. *Def.'s Reply to Resp. to Def.'s Mot. for Summ. J.* (ECF No. 42) (*Def.'s Reply*); *Def.'s Reply to Additional Statement of Facts* (ECF No. 43) (DRPSAMF).

## II.   STATEMENT OF FACTS[1]

### A.   Background

#### 1.   The Parties

---

[1]     In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to the Plaintiffs' theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with this obligation, the Court recites certain events as facts even though OIT disputes them.

OIT employed Kayla Cole first as a Business Analyst, and later as a Project Manager in its Project Management Office (PMO). DSMF ¶ 1; PRDSMF ¶ 1. OIT also employed Teresa Gordon as a Business Analyst, where she performed all duties of the position, including administrative duties for the then-Director of the PMO (Male Employee).[2] OIT promoted Ms. Gordon to Project Manager in April 2015. DSMF ¶ 2; PRDSMF ¶ 2.

OIT employed Joshua Karstens during this time, but before September 29, 2014, he worked as a project manager, and neither Ms. Gordon nor Ms. Cole reported to him as their supervisor. DSMF ¶ 3; PRDSMF ¶ 3. Between September 29, 2014, and October 8, 2015, Mr. Karstens became the Agile Program Manager in the PMO. DSMF ¶ 4; PRDSMF ¶ 4. During that time, Mr. Karstens was Ms. Cole's direct supervisor and completed her performance evaluations. DSMF ¶ 5; PRDSMF ¶ 5. Over the same period, both Ms. Gordon and Mr. Karstens reported to Male Employee.[3] DSMF ¶ 6; PRDSMF ¶ 6.

In a performance evaluation for the period September 2, 2014 to February 8, 2015, Mr. Karstens gave Ms. Cole an overall performance rating of "outstanding."

---

[2]     The Defendant's paragraph two states that Ms. Gordon was employed as a Business Analyst "performing administrative duties" for the then-Director of the PMO. The Plaintiffs interposed a qualified response, stating that Ms. Gordon performed all the functions of a business analyst, often exceeding expectations, not just "administrative duties." PRDSMF ¶ 2. The Court views the Plaintiffs' qualified response as a clarification of Ms. Gordon's actual job duties and as it is required to view disputed facts in the light most favorable to the Plaintiffs, the Court included the Plaintiffs' paragraph two.

[3]     In their filings, the Plaintiffs claimed that OIT treated them as females less favorably than a similarly-situated male employee, who is no longer employed at OIT. OIT moved to seal any reference to this male employee's name or initials, claiming that this information is protected under Maine law. *Def.'s Mot. to Seal* (ECF No. 26) (citing 5 M.R.S. § 7070). On January 22, 2018, the Court granted OIT's motion for the limited purpose of ruling on the motion for summary judgment. *Order on Mot. to Seal* at 4 (ECF No. 33). The Court expressed reservations, however, as to whether the male employee's name could remain sealed if the case went to trial. *Id.*

DSMF ¶ 7; PRDSMF ¶ 7. On November 4, 2014, Ms. Cole emailed Mr. Karstens, informing him that she felt disrespected by an Instant Message he had sent and his statement that she was "just as smart" as a male colleague, and in response, Mr. Karstens stated that he thought Ms. Cole was the top performer on the team.[4] DSMF ¶ 8; PRDSMF ¶ 8. Similarly, in a performance evaluation for the period of February 9 to August 8, 2015, Mr. Karstens gave Ms. Cole an overall performance rating of "exceeds expectations." DSMF ¶ 9; PRDSMF ¶ 9. Neither evaluation by Mr. Karstens included any statements critical of Ms. Cole's performance. DSMF ¶ 10; PRDSMF ¶ 10. In September 2014, Mr. Karstens nominated Ms. Cole to be Employee of the Month. DSMF ¶ 11; PRDSMF ¶ 11. In September 2015, Mr. Karstens was part of the panel that promoted Ms. Cole to the position of Agile Project Manager. DSMF ¶ 12; PRDSMF ¶ 12.

On October 8, 2015, OIT promoted Mr. Karstens to the position of Director of the Business Process Management Office (BPM). DSMF ¶ 13; PRDSMF ¶ 13. Between October 8, 2015, and February 16, 2016, Male Employee and Mr. Karstens were peers, and both Ms. Gordon and Ms. Cole reported directly to Male Employee. DSMF ¶ 14; PRDSMF ¶ 14.

### 2. Agile Wave

---

[4] Defendant's paragraph eight stated only that Mr. Karstens wrote to Ms. Cole in a November 4, 2014 email that he thought she was the top performer on the team. DSMF ¶ 8. Ms. Cole interposed a qualified response, indicating that the email chain started with her telling Mr. Karstens she felt disrespected by an instant message he sent which stated that Ms. Cole was "just as smart as" her male colleague. PRDSMF ¶ 8. The Court included Ms. Cole's qualified response to provide context for Mr. Karstens' response.

4

Effective September 1, 2015, Ms. Gordon and Male Employee were also partners in their own business called Agile Wave. DSMF ¶ 65; PRDSMF ¶ 65. Between May and October 2016, Ms. Cole performed work for Agile Wave. DSMF ¶ 66; PRDSMF ¶ 66. On September 3, 2015, Ms. Gordon told Mr. Karstens that she and Male Employee were planning to leave OIT to start their own business. DSMF ¶ 15; PRDSMF ¶ 15. Ms. Gordon also told Mr. Karstens that she and Male Employee could not leave without him, and that once the venture was underway, Mr. Karstens would have a position at Agile Wave. DSMF ¶ 16; PRDSMF ¶ 16. However, Mr. Karstens declined the offer to join Ms. Gordon and Male Employee in their proposed business venture. DSMF ¶ 17; PRDSMF ¶ 17. As evidenced by these interactions, Ms. Gordon did not have an issue with Mr. Karstens until sometime after September 3, 2015. DSMF ¶ 18; PRDSMF ¶ 18.

### 3. The Pega Enterprise Agreement

The Pega Enterprise Agreement is an $8 million sole source contract negotiated "confidentially" by Jim Smith and Doug Averill.[5] PSAMF ¶ 156; DRPSAMF ¶ 156. Jim Smith knew in August 2015 that Doug Averill's employment with Pegasystems Inc. was not in accordance with the contract between the state and Pegasystems nor compliant with the state procurement policy.[6] PSAMF ¶ 157;

---

[5] The Defendant denies the Plaintiffs' paragraph 156, listing a number of stakeholders who were consulted during the negotiations. DRPSAMF ¶ 156. Whether the contract was negotiated "confidentially" is a question of fact, and the Court must view disputed facts in the light most favorable to the non-moving party. The Court overrules the Defendant's denial.

[6] The Defendant denies the Plaintiffs' paragraph 157, citing the Smith Deposition, 133:13-134:2; *Local Rule 56(h) Stipulated Record by State of Maine Office of Information Technology*, Attach. 1 (ECF No. 24-1) (*Stip. R.*) at 152. DRPSAMF ¶ 157. Whether Mr. Smith knew that Mr. Averil's employment with Pegasystems was not in accordance with the state's contract with Pegasystems or compliant with

DRPSAMF ¶ 157.  Mr. Karstens, Mr. Smith, and Ms. Perkins knew on October 23, 2015 that Mark Lutte, Director of Purchases, said the Pega Enterprise Agreement did not get signed off or seen by Purchases as required.  PSAMF ¶ 158; DRPSAMF ¶ 158.

When there is an extension amendment for an OIT contract for more than $10,000, it is treated like a sole source contract, and must be approved by the State Procurement Review Committee.  Amendments in excess of $3 million must be reviewed by the Attorney General's office.  PSAMF ¶ 159; DRPSAMF ¶ 159.  The State Procurement Review Committee did not sign off on the Pega Enterprise Agreement.  PSAMF ¶ 160; DRPSAMF ¶ 160.  In Ms. Cole's and Ms. Gordon's view, the Pega Enterprise Agreement did not go through the proper procurement process and the circumstances surrounding it were inappropriate and unlawful.[7]  PSAMF ¶ 161; DRPSAMF ¶ 161.  Ms. Cole and Ms. Gordon raised concerns about the lawfulness of the Pega Systems contract with Mr. Karstens directly on November 10, 2015, and Ms. Gordon raised the issue previously as well.[8]  DSMF ¶ 105; PRDSMF ¶

---

state procurement policy are questions of fact, and the Court must view disputed facts in the light most favorable to the Plaintiffs.  The Court overrules the Defendant's denial.

[7]    The Defendant denies the Plaintiff's paragraph 161, reiterating its response to Plaintiffs' paragraph 156.  DRPSAMF ¶ 161.  Whether the Plaintiffs believed that the contract had gone through the proper procurement process is a question of fact, and the Court must view disputed facts in the light most favorable to the Plaintiffs.  At the same time, whether the contract was in fact illegal or inappropriate is not established by this record.  In fact, the Defendant presented evidence that the contract was in accordance with state of Maine policies, since CIO Smith and Mr. Averill consulted about the contract not only with employees within the Division of Purchases, but also with Richard Rosen, then Commissioner of the state of Maine Department of Administration and Financial Services (DAFS).  DRPSAMF ¶ 161.  At most, the Plaintiffs established that they believed the contract was inappropriate and illegal, not that it was in fact either.

[8]    The Defendant's paragraph 105 states that Mr. Karstens had "no knowledge of Cole and Gordon's alleged concerns about the legality of the Pega Contract until June 2016."  DSMF ¶ 105.  The Plaintiffs deny paragraph 105, stating that the Plaintiffs raised concerns with Mr. Karstens directly on November 10, 2015, and that Ms. Gordon raised the issue previously as well.  PRDSMF ¶ 105.

105.    During Ms. Gordon's and Ms. Cole's February 22, 2016 meeting with Pat Beaudoin, HR Director, regarding issues with Mr. Karstens, they reported to Ms. Beaudoin that employees of the PMO were being asked to use a software tool obtained under a contract they did not think had gone through the right process and that was illegal.  DSMF ¶ 97; PRDSMF ¶ 97.  Ms. Gordon and Ms. Cole further reported that they attended a meeting on November 10, 2015 with Mr. Karstens in which they and a contractor were being pressured to "push" the Pega contract and sell licenses to agencies even if it did not feel like a good fit.[9]  DSMF ¶ 89; PRDSMF ¶ 89.  Ms. Beaudoin did not mention Ms. Cole's and Ms. Gordon's alleged concerns about OIT's contract with Pega Systems to Mr. Smith or to anyone else.  DSMF ¶ 31; PRDSMF ¶ 31.

## B.    Interactions between Mr. Karstens, Ms. Cole, and Ms. Gordon

On December 2, 2015, Ms. Cole attended an offsite holiday party at a bowling alley with a group of male and female coworkers, including Mr. Karstens.  DSMF ¶ 19; PRDSMF ¶ 19.  According to Ms. Cole, during the outing, Mr. Karstens was showing the group an x-ray of his knee because there was an item in between his legs showing up on the x-ray and he was telling people that is how big his penis was.[10]

---

When Mr. Karstens became aware of the Plaintiffs' concern about the contract is a question of fact and as the Court must view disputed facts in the light most favorable to the Plaintiffs, the Court included the Plaintiffs' version.

[9]    The Plaintiffs interpose a qualified statement: "Cole told Beaudoin at the meeting she thought the Pega contract was illegal."  PRDSMF ¶ 89.  As the Court included this statement in the prior sentence, there is no need to repeat it.

[10]    The Defendant's paragraph 20 states: "according to Cole, during the outing, Karstens was showing the group an x-ray of his knee and comparing it to his penis." DSMF ¶ 20.  The Plaintiffs offer a qualified statement, citing Ms. Cole's Deposition Errata Sheet, which states: "At the holiday party in December Josh also was showing the group an x-ray of his knee because there was an item in between his legs showing up on the x-ray and he was telling people that's how big his penis was." PRDSMF ¶ 20; *Stip. R.* at 87.  The Court adjusts the statement accordingly.

DSMF ¶ 20; PRDSMF ¶ 20.  During the bowling outing, Mr. Karstens asked several people, including Ms. Cole, to take a picture of him posing.  DSMF ¶ 21; PRDSMF ¶ 21.  Ms. Cole took a picture with her cellphone of Mr. Karstens posing in a sexually suggestive manner.[11]  DSMF ¶ 21; PRDSMF ¶ 21.  Ms. Cole showed the picture to her attorney but did not show it to anyone in Human Resources.  DSMF ¶ 22; PRDSMF ¶ 22.  Mr. Karstens denies he ever made comments or jokes about his penis. DSMF ¶ 186; PRDSMF ¶ 186.

Male Employee left State employment on February 8, 2016.  DSMF ¶ 27; PRDSMF ¶ 27.  On February 16, 2016, Jim Smith sent a general announcement to OIT employees that Mr. Karstens had been asked to assume "management responsibility for both BPM and PMO; Ms. Gordon and Ms. Cole received this email on February 17, 2018.[12]  DSMF ¶ 28; PRDSMF ¶ 28.  The Chief Information Officer of OIT, Jim Smith, was out of state on vacation during the week of February 15, 2016. DSMF ¶ 29; PRDSMF ¶ 29.  On February 17, 2017, HR Director Pat Beaudoin called Mr. Smith and told him about Ms. Gordon's and Ms. Cole's report of the alleged bar

---

[11]    The Defendant's paragraph 21 states: "During the bowling outing, Cole took a picture of Karstens posing with her cell phone."  DSMF ¶ 20 (citing *Cole Dep.* 16:19-17:7, *Stip R.* at 52-53).  In response, the Plaintiffs offer the following qualified statement: "Karstens asked several people to take his picture while posing in a sexually graphic manner."  PRDSMF ¶ 20 (citing *Cole Dep.* 17:21, *Stip. R.* 53).  The Court viewed the two photographs, which confirm that Mr. Karstens was posing perhaps not in a sexually graphic manner, but certainly in a sexually suggestive manner.  The Court amended the statement accordingly.
.
[12]    Citing paragraph thirty-nine of the Complaint and the Defendant's amended answer to paragraph thirty-nine, the Defendant's paragraph twenty-eight states that the Plaintiffs received this email on February 17, 2016.  DSMF ¶ 28.  The Plaintiffs object and say that the email was actually sent the day before, February 16, 2016.  PRDSMF ¶ 28.  The record confirms that Jim Smith sent the email on February 16, 2018 at 4:32:30 p.m. and the Complaint and Amended Answer confirm that Ms. Cole and Ms. Gordon received the email the next day.  The Court includes both the date the email was sent and the date it was received.

incident that occurred two years prior; she also told him about their complaints about a hostile work environment and that they felt Mr. Karstens had been treating them unfairly.[13]  DSMF ¶ 30; PRDSMF ¶ 30.

On February 19, 2016, Mr. Karstens held his first staff meeting as the PMO Director, with approximately ten to fifteen people in attendance, both male and female, including Ms. Gordon and Ms. Cole.  DSMF ¶ 32; PRDSMF ¶ 32.  During the meeting, Mr. Karstens expressed concern about complaints he had received regarding unprofessional behavior within the group, including employees whispering and talking about each other.  DSMF ¶ 34; PRDSMF ¶ 34.  During the meeting, Mr. Karstens raised his voice and told the Plaintiffs that everyone would be held accountable.[14]  DSMF ¶ 34; PRDSMF ¶ 34.  Mr. Karstens told the group that their divisive behavior needed to stop.  DSMF ¶ 35; PRDSMF ¶ 35.  He also stated that each person was starting with a clean slate at that point but would be held accountable for his or her behavior and performance moving forward.  DSMF ¶ 36; PRDSMF ¶ 36.  According to Ms. Cole, Mr. Karstens told the group that they were immature and unprofessional.  DSMF ¶ 37; PRDSMF ¶ 37.  Ms. Cole felt that Mr.

---

[13]     The Defendant's statement of material facts states "HR Director Beaudoin called CIO Smith on February 17, 2016, and told him about Gordon and Cole's report of the alleged bar incident that occurred two years prior."  DSMF ¶ 20.  The Plaintiffs qualify the statement, citing other parts of the record to support the statement that "Beaudoin told Smith plaintiffs complained about a hostile work environment and that they felt Karstens was treating them unfairly."  PRDSMF ¶ 20; *Stip R.* at 5.  The Court includes the Plaintiffs' additional statement because it more fairly and accurately reflects what HR Director Beaudoin told CIO Smith.

[14]     The Defendant's original paragraph thirty-four only mentions that Mr. Karstens expressed concern about unprofessional behavior and employees whispering and talking about each other.  DSMF ¶ 34.  The Plaintiffs interpose the following qualification to the Defendant's statement: "at the meeting Karstens raised his voice and told plaintiffs everyone would be held accountable."  PRDSMF ¶ 34 (citing *Pls.' Ex.* 3).  The Court includes the Plaintiffs' qualified response because it is supported by the record and clarifies the content and context of the meeting.

Karstens was being hostile toward the entire group. DSMF ¶ 38; PRDSMF ¶ 38. Ms. Cole also felt that Mr. Karstens was singling out individuals who were asking questions, including male employee Kirk H. DSMF ¶ 39; PRDSMF ¶ 39. At the meeting, Mr. Karstens also advised the group that Deputy Director Cassandra Perkins would now be their direct supervisor, and that Ms. Perkins would report to him. DSMF ¶ 33; PRDSMF ¶ 33.

Generally, OIT meetings attended by Ms. Cole with Mr. Karstens included three to twenty men and women. DSMF ¶ 145; PRDSMF ¶ 145. According to Ms. Cole, Mr. Karstens would get red in the face, raise his voice, and ball his fists at those meetings. DSMF ¶ 146; PRDSMF ¶ 146. According to Ms. Cole, Mr. Karstens directed his anger at everyone in the room. DSMF ¶ 147; PRDSMF ¶ 147. According to Ms. Cole, Mr. Karstens "called her out" and directed his criticism toward her during six or seven meetings occurring over the course of about six months. DSMF ¶ 148; PRDSMF ¶ 148.

## C. Ms. Cole's and Ms. Gordon's Reports to Management about Mr. Karstens

On or about February 10, 2016, Ms. Gordon contacted OIT's Chief Technology Officer and expressed concerns about Mr. Karstens becoming Ms. Cole's supervisor following Male Employee's departure from OIT. DSMF ¶ 23; PRDSMF ¶ 23. The Chief Technology Officer advised Ms. Gordon to report her concerns to Human Resources. DSMF ¶ 24; PRDSMF ¶ 24. Ms. Gordon called Human Resources on or about February 11, 2016, and spoke with Human Resources Generalist Tammy Sturtevant. DSMF ¶ 25; PRDSMF ¶ 25. Ms. Gordon and Ms. Cole reported concerns

about Mr. Karstens supervising them, and reported an incident that allegedly occurred after hours at a bar in Hallowell two years earlier involving Ms. Cole and Mr. Karstens.  DSMF ¶ 26; PRDSMF ¶ 26.

Tammy Sturtevant's recorded recollection of her phone call with Terry Gordon on February 15 or 16, 2016 says that Ms. Gordon's voice was "shaky like she was upset" and that Ms. Gordon had a "very serious concern" about Mr. Karstens, how sexual gestures he made towards Ms. Cole in the past were affecting the work environment, and that Mr. Karstens was complaining about Ms. Cole's work and belittling her in meetings.  PSAMF ¶ 162; DRPSAMF ¶ 162.

On February 17, 2016, Ms. Beaudoin informed Mr. Smith about "a sensitive matter" involving Mr. Karstens.  PSAMF ¶ 163; DRPSAMF ¶ 163.  On February 18, 2016 at 9:04 a.m., Ms. Gordon informed Mr. Karstens she was home sick.  PSAMF ¶ 164; DRPSAMF ¶ 164.  On that same day, Ms. Beaudoin spoke on the phone with Ms. Gordon.  PSAMF ¶ 165; DRPSAMF ¶ 165.  Ms. Beaudoin's notes include "she didn't report it in the first place because she thought she would be punished" and "bullying her" and "I'm nervous for her" and "he has a temper hit a table at one time."  PSAMF ¶ 165; DRPSAMF ¶ 165.  Ms. Beaudoin told Ms. Gordon not to go to work the next day.[15]  PSAMF ¶ 166; DRPSAMF ¶ 166.

---

[15]     The Defendant denies the Plaintiffs' paragraph 166, saying that the record citation reflects that Ms. Gordon told "her", meaning Ms. Cole, not to go to work the next day, not that Ms. Beaudoin told Ms. Gordon not to go to work.  DRPSAMF ¶ 166 (citing *Stip. R.* at 560).  Ms. Beaudoin's handwritten notes do not clarify who "her" is, Ms. Cole or Ms. Gordon.  *See Stip. R.* at 560.  In light of this ambiguity, the Court accepts the Plaintiffs' version of this disputed fact.

          In addition, citing Ms. Cole's deposition, Mr. Karstens' deposition, and page fifty-nine of the Stipulated Record, the Defendant denies the statement based on evidence that Ms. Gordon and Ms. Cole did go to work the next day.  DRPSAMF ¶ 166 (citing *Cole Dep.* 43:1-12; *Karstens Decl.* ¶ 17; *Stip. R.* at 59).  The Court rejects this basis for the Defendant's denial because whether Ms. Gordon and Ms.

On February 22, 2016, Ms. Gordon and Ms. Cole met with HR Director Beaudoin and reported the following issues regarding Mr. Karstens. DSMF ¶ 72; PRDSMF ¶ 72.[16] Ms. Cole and Ms. Gordon reported that on March 14, 2014, at an after-hours business/social event, Mr. Karstens made unwanted sexual advances on Ms. Cole, including groping, putting his hand inside the back of her pants and asking her to accompany him to a hotel room. Neither Ms. Gordon nor Ms. Cole reported this incident to Human Resources or management before February 2016. DSMF ¶ 73; PRDSMF ¶ 73. Mr. Karstens denies he sexually assaulted Ms. Cole in March 2014. DSMF ¶ 184; PRDSMF ¶ 184.

Ms. Cole also reported that she had taken pictures of Mr. Karstens posing at two events, which showed Mr. Karstens posing in a sexually suggestive manner.[17]

---

Cole in fact went to work the next day does not address whether Ms. Beaudoin told Ms. Gordon (or for that matter Ms. Cole) not to go to work.

[16] The Plaintiffs interpose a qualified response to the Defendant's paragraph 72, stating "Before meeting with Beaudoin on February 22, 2016, Gordon had reported her concerns about Karstens' conduct to Greg McNeal, who told her to contact Human Resources. *See Gordon Dep.* 38:15-23; *Stip. R.* at 97. Gordon called HR and reported to Tammy Sturtevant on February 10 or 11, 2016 her concerns about, among other things, a 'sexual gesture' and 'retaliation.' On February 16, 2016, Gordon had a phone conversation with Sturtevant and Beaudoin and reported her concerns that Cole was afraid of Karstens and his demeanor, among other things, and that a coworker said he believed Karstens was bullying Cole. *See Pls.' Ex.* 8; *Notes from Beaudoin file Bates # C&GDEF002256-2259; see also Stip. R.* at 557. ('Concerns about the legitimacy of the Pega enterprise contract in relation to agnostic sprint zero principles were reported directly to Karstens on November 10, 2015' and 'Reports of what we believe to be the unlawful Pega enterprise contract were made to Pat Beaudoin on February 22, 2016.' *Stip R.* at 503-504; *Pls.' Resp., Pls.' Joint Answer to Interrog.* Attach. 9 (ECF No. 39-9). "I think the Pega word came out, it's in my notes but either I didn't explore it with them or I didn't understand what they were talking about and I would have no interest in a contract. I know 8 million is in my notes, but it meant nothing to me." *Stip. R.* at 21.

The Plaintiffs' qualification to the Defendant's paragraph 72 asserts additional facts regarding Ms. Cole and Ms. Gordon reporting workplace concerns to Mr. Beaudoin and to other HR personnel earlier in February before the February 22, 2016 meeting among Mr. Beaudoin, Ms. Cole, and Ms. Gordon. The Court declines to include additional facts not directly responsive to the Defendant's statement.

[17] The Defendant states in paragraph 74: "Cole reported that she had taken pictures of Karstens posing at two events, which showed that Karstens was being "ridiculous at the events." *Stip R.* at 63. DSMF ¶ 73. The Plaintiffs interpose a qualified response, stating "the pictures are sexually graphic."

DSMF ¶ 74; PRDSMF ¶ 74. Mr. Karstens refused to answer questions about whether he was intoxicated on March 14, 2014, instead invoking his Fifth Amendment rights under the United States Constitution. DSMF ¶ 185; PRDSMF ¶ 185.

Ms. Cole and Ms. Gordon reported that Mr. Karstens nominated Ms. Cole as Employee of the Month in September 2014 and had no issues with her performance then. DSMF ¶ 75; PRDSMF ¶ 75. Ms. Cole and Ms. Gordon reported that Ms. Cole was promoted to Project Manager in February 2015 and that Mr. Karstens stated that he was responsible for her promotion. DSMF ¶ 76; PRDSMF ¶ 76. They also reported that Mr. Karstens complained to Ms. Gordon about Ms. Cole's performance after Ms. Cole was promoted. DSMF ¶ 77; PRDSMF ¶ 77.

Ms. Cole and Ms. Gordon reported that in the summer of 2015, Mr. Karstens spoke with Ms. Cole about concerns that she was getting too friendly with a contractor. DSMF ¶ 78; PRDSMF ¶ 78. They further stated that in early September 2015, Mr. Karstens called Ms. Cole into a room and gave her a verbal warning for giving someone "attitude." DSMF ¶ 83; PRDSMF ¶ 83. Ms. Cole and Ms. Gordon reported that Mr. Karstens changed the project manager on one of the projects without discussing it with the team and put a project in "warning" status. DSMF ¶ 81; PRDSMF ¶ 81. They also reported that Ms. Cole and Ms. Perkins had had a disagreement, and Mr. Karstens was pushing Ms. Cole to have coffee with Ms. Perkins to "clear the air." DSMF ¶ 82; PRDSMF ¶ 82.

---

PRDSMF ¶ 73, Attach. 8 *Photos of Karstens* (ECF No. 39-8). The Court amends the Defendant's paragraph 73 to reflect the Plaintiffs' description.

They also reported that Mr. Karstens would "drill" Ms. Cole with questions at meetings but did not "drill" other scrum masters. DSMF ¶ 84; PRDSMF ¶ 84. They reported that Mr. Karstens was angry because Ms. Cole came up with the right answers in meetings. DSMF ¶ 85; PRDSMF ¶ 85. The Plaintiffs further reported that Mr. Karstens raised his voice and clenched his fists in a meeting. DSMF ¶ 86; PRDSMF ¶ 86. They reported that Mr. Karstens would not make eye contact with Ms. Cole at meetings. DSMF ¶ 96; PRDSMF ¶ 96. They also reported that Ms. Gordon told Ms. Cole not to talk in meetings because she felt Mr. Karstens would get upset when Ms. Cole made suggestions. DSMF ¶ 87; PRDSMF ¶ 87.

Ms. Cole and Ms. Gordon reported that in contrast, Male Employee did not have any issues with Ms. Cole's performance at the time. DSMF ¶ 79; PRDSMF ¶ 79. Ms. Cole and Ms. Gordon reported that Ms. Gordon started writing emails on behalf of Ms. Cole because Ms. Cole could "do no right" in Mr. Karstens' eyes. DSMF ¶ 80; PRDSMF ¶ 80.

Ms. Cole and Ms. Gordon reported that in October 2015, Mr. Karstens asked Ms. Gordon if she wanted to go to Panera Bread for lunch with him. DSMF ¶ 88; PRDSMF ¶ 88. They reported that in December 2015, males and females from the OIT group, including Mr. Karstens, attended an off-site bowling event, during which Karstens made a joke about his penis to the group. DSMF ¶ 90; PRDSMF ¶ 90.

Ms. Cole and Ms. Gordon reported to Ms. Beaudoin that during a meeting of the OIT group on February 19, 2016, Mr. Karstens stated: "if you are going to be divisive, there is no place for you here." DSMF ¶ 91; PRDSMF ¶ 91. They also

reported that during the meeting, Mr. Karstens said he was going to hold each person accountable. DSMF ¶ 92; PRDSMF ¶ 92. They reported that during the meeting, Mr. Karstens was upset and emotional. He "paced the room," was "red in the face," and clenched his fists. DSMF ¶ 93; PRDSMF ¶ 93. They reported that during the meeting, Mr. Karstens told everyone that they would start with a "clean slate." DSMF ¶ 94; PRDSMF ¶ 94.

Ms. Cole and Ms. Gordon also reported to Ms. Beaudoin that there was tension among the Project Management Office, the Business Process Management Office, and Applications Development. DSMF ¶ 95; PRDSMF ¶ 95. Ms. Cole and Ms. Gordon further reported that Mr. Karstens was trying to take away Ms. Cole's direct reports and move them to the BPM office. DSMF ¶ 98; PRDSMF ¶ 98.

Ms. Cole and Ms. Gordon reported another incident to Ms. Beaudoin on February 22, 2016. Ms. Beaudoin's notes from the meeting do not indicate the parties to whom each statement in her notes refers, but read: "sexual touch me—put hand the back of my pants. I tried to get away. Leaned in and hard on me . . . get a motel room. . . I said no, you're married three kids . . . he leaned on me. . . I said no . . . He was getting jealous . . . escalated . . . He kept drilling her . . . TG said you're clearly getting upset, red faced. JK raised his voice beet red clenching his fist . . . He didn't like the way we were moving forward. It was Kayla's idea he didn't like it. . . If KC said something he would get upset . . . paced the room red in the face clenching his fists. Shaking . . . He's aggressive—TG scared. He was angry. TG I think he is threatened by Kayla because she knows her stuff. He makes it a hostile environment.

Concerned about retaliation. It's stressful. My heart starts to race. Pacing, red faced, clenching his fists."[18] DSMF ¶ 99; PRDSMF ¶ 99. At the end of the meeting, Ms. Beaudoin said she would speak to the CIO, Jim Smith; Ms. Beaudoin's notes indicate she spoke to Mr. Smith on February 17, 2016.[19] DSMF ¶ 100; PRDSMF ¶ 100. Ms. Cole never reported Mr. Karstens' behavior to Mr. Smith, Male Employee, or Human Resources before the beginning of 2016. DSMF ¶ 149; PRDSMF ¶ 149.

On February 24, 2016, at a regularly scheduled one-on-one meeting, Mr. Smith informed Mr. Karstens of the complaints made against him by Ms. Gordon and Ms.

---

[18]    The defendant's paragraph 99 states "Cole and Gordon did not report any other issues to Beaudoin." DSMF ¶ 99. The Plaintiffs' interpose a two-part qualified response. The first part states: "Cole and Gordon reported other concerns to Tammy Sturtevant on February 10 or 11, 2016 and to Sturtevant and Pat Beaudoin on 2/16/16." *Motion to Seal Exhibits 8 and 10 to ECF No. 39*, Attach. 1 (ECF No. 41-1); *Stip. R.* 557. This part of the Plaintiffs' qualification is only partially responsive to the Defendant's statement, because it refers not only to instances in which Ms. Cole and Ms. Gordon reported concerns to Ms. Beaudoin, but also to separate reports to Ms. Sturtevant. Furthermore, Plaintiffs' Exhibit 8 is handwritten and the Court finds it illegible, and page 557 of the Stipulated Record does not support the qualification, so the Court declines to include it.
    The second part of the qualification says: "Beaudoin's notes from her meeting on 2/22/16 speak for themselves. 'sexual touch me—put hand the back of my pants. I tried to get away. Leaned in and hard on me. . . get a motel room. . . I said no, you're married three kids. . . he leaned on me. . . I said no. . . He was getting jealous. . . escalated . . . He kept drilling her . . . TG said you're clearly getting upset, red faced. JK raised his voice beet red clenching his fist . . . He didn't like the way we were moving forward. It was Kayla's idea he didn't like it. . . If KC said something he would get upset . . . paced the room red in the face clenching his fists. Shaking . . . He's aggressive—TG scared. He was angry. TG I think he is threatened by Kayla because she knows her stuff. He makes it a hostile environment. Concerned about retaliation. It's stressful. My heart starts to race. Pacing, red faced, clenching his fists.'" *PRDSMF* Attach. 10 (ECF No. 39-10). The Court amended the Defendant's paragraph 99 to include the directly responsive statement that Ms. Cole and Ms. Gordon reported other concerns to Ms. Beaudoin on February 16, 2016. The Court interprets the Plaintiffs' unhelpful second statement to mean that Ms. Cole and Ms. Gordon reported other issues, including instances of sexual harassment, to Ms. Beaudoin during the February 22, 2016 meeting. The Court amended the Defendant's statement to include Ms. Beaudoin's notes regarding Ms. Cole's and Ms. Gordon's report of an incident involving sexual advances.
[19]    The Defendant's paragraph 100 states: "At the end of the meeting, Beaudoin said she would speak with the CIO." DRPSMF ¶ 100. The Plaintiffs' interpose the following qualification: "Beaudoin's notes indicate she "spoke to Jim" (i.e. the CIO) on February 17, 2016. PRDSMF ¶ 100. The Court finds that the qualification is only somewhat responsive to the Defendant's statement. However, in order to prevent the Defendant's statement from being incomplete, the Court has included the qualification.

Cole. [20]   DSMF ¶ 103; PRDSMF ¶ 103.   Mr. Karstens had no knowledge before

February 24, 2016, of Ms. Gordon's and Ms. Cole's complaints against him.[21]   DSMF

¶ 104; PRDSMF ¶ 104.   Neither Ms. Cole nor Ms. Gordon has any knowledge of when

Mr. Karstens learned of their complaints to Human Resources about him.[22]   DSMF ¶

106; PRDSMF ¶ 106; DSMF ¶ 107; PRDSMF ¶ 107.

### D.    Time and Attendance Claims Against Ms. Gordon and Ms. Cole

On February 19, 2016, Mr. Karstens sent an email to employees of the PMO,

including to Ms. Cole and Ms. Gordon, summarizing the staff meeting and reminding

them that Ms. Perkins would be their direct supervisor.   DSMF ¶ 40; PRDSMF ¶ 40.

Part of Ms. Perkins' responsibility as supervisor was to review the timesheets of her

direct reports.   DSMF ¶ 42; PRDSMF ¶ 42.   Ms. Perkins also reviewed the electronic

time and attendance records of those employees who had requested approval to take

vacation time in the future to determine whether they had sufficient accrued time on

---

[20]     The Plaintiffs' interpose a multi-part qualification to the Defendant's paragraph 103.  They first state that the CIO found out about the Plaintiffs' allegations on February 17, 2016.  DSMF ¶ 103. The Court declines to include this statement, which is already in the record and not responsive to the Defendant's paragraph 103.  Second, the Plaintiffs offer that Mr. Smith had a conversation with Mr. Karstens on February 22, 2016, citing paragraph 22 of Karstens' Declaration.  *Id.*; PRDSMF, Attach. 4 *Decl. of Karstens* (ECF No. 28-1) (Karstens Dec.).  Paragraph 22 of Mr. Karstens' Declaration states: "I contacted CIO Smith the morning of February 22, 2016, and reported the concerns regarding Gordon and Cole's timesheets."  *Id.*  The Plaintiffs' statement does not contradict the Defendant's paragraph 103, and the Court declines to adopt this part of the qualification.  Finally, the Plaintiffs' state "according to Beaudoin, after the meeting with her on the 24th, Karstens stayed behind and "volunteered" information about the plaintiffs' allegations against him," citing Pls.' Ex. 15.  PRDSMF ¶ 103.  This statement is nonresponsive to the Defendant's paragraph 103 and the Court declines to include it.

[21]     The Plaintiffs interpose the same qualified response to Defendant's paragraph 104 as to Defendant's paragraph 103.  PRDSMF ¶ 104.  The qualification is not directly responsive to when Mr. Karstens' had knowledge of Ms. Cole's and Ms. Gordon's complaints, and the Court declines to include it.

[22]     The Plaintiffs interpose the same qualified response to Defendant's paragraphs 106 and 107, which is the same qualified response offered to Defendant's paragraphs 103 and 104.  None of the qualifications offered contradict Defendant's paragraphs 106 and 107, and the Court declines to include them.

the books.  DSMF ¶ 45; PRDSMF ¶ 45.  On February 17, 2016, Mr. Karstens advised administrative assistant Brenda M. of this change, and asked her to update the timesheet approval information for employees that Ms. Perkins would be supervising in the time and attendance system.  Brenda M. completed this change on February 19, 2016.  DSMF ¶ 41; PRDSMF ¶ 41.

Ms. Perkins was on vacation the week of February 15, 2016 and returned to the office on February 22, 2016.  DSMF ¶ 43; PRDSMF ¶ 43.  Upon returning to the office, Ms. Perkins reviewed for approval the timesheets submitted by Ms. Gordon and Ms. Cole for the payroll period ending February 27, 2016.[23]  DSMF ¶ 44; PRDSMF ¶ 44.  Ms. Gordon and Ms. Cole were the only two employees supervised by Ms. Perkins who signed and submitted their timesheets for approval in advance of the end of the payroll reporting period ending February 27, 2016.  DSMF ¶ 46; PRDSMF ¶ 46.  On February 16, 2016, both Ms. Gordon and Ms. Cole electronically signed their respective timesheets for the payroll reporting period ending February 27, 2016.  DSMF ¶ 47; PRDSMF ¶ 47; DSMF ¶ 48; PRDSMF ¶ 48.  Both Ms. Gordon's and Ms. Cole's timesheets reflected that they worked forty "regular" hours during the week of February 22, 2016.  DSMF ¶ 49; PRDSMF ¶ 49.

---

[23]    The Plaintiffs' interpose the following qualification: "at 11:37 AM on February 22, 2016 Karstens sent Perkins an email questioning plaintiffs' honesty and time and attendance records.  He and Perkins knew at that time plaintiffs had requested a waiver of the 'use it or lose it' vacation policy, and that an agreement between the MSEA and Human resources was pending.  Karstens and Perkins also knew Pat Beaudoin had instructed plaintiffs to 'bank the hours as we have done in the past.'" PRDSMF ¶ 44; *Resp. to Statement of Fact with Statement of Additional Facts*, Attach 4. (ECF No. 39-4) (*Resp.*).  The Court declines to include additional facts not directly responsive to the Defendant's statement and found only in the Plaintiffs' response to the Defendant's statement of material facts.

When Ms. Perkins reviewed Ms. Gordon's and Ms. Cole's timesheets, the time and attendance system displayed a warning that Ms. Gordon and Ms. Cole's vacation accruals were nearing the accrual limit, and that they would soon start losing vacation time. DSMF ¶ 50; PRDSMF ¶ 50. Ms. Perkins was concerned and puzzled about the "over-the-limit" accrual warning because she was aware that Ms. Gordon had recently taken a vacation. DSMF ¶ 51; PRDSMF ¶ 51. Mr. Karstens had previously approved Ms. Cole for a vacation in Mexico from February 22, 2018 through March 4, 2016. DSMF ¶ 52; PRDSMF ¶ 52. Ms. Perkins was aware that Ms. Cole had previously requested and been approved to take vacation during the week of February 22, 2016. DSMF ¶ 53; PRDSMF ¶ 53.

On February 22, 2016, Ms. Gordon's calendar showed Ms. Cole to be out on vacation but showed several meetings scheduled for Ms. Gordon.[24] DSMF ¶ 54; PRDSMF ¶ 54. Ms. Perkins was also aware that Ms. Gordon had called in sick during some of the payroll period ending February 27, 2016. DSMF ¶ 55; PRDSMF ¶ 55. Ms. Perkins was concerned that Ms. Gordon and Ms. Cole had completed and turned in their timesheets a week before the end of the payroll reporting period. DSMF ¶ 56; PRDSMF ¶ 56. Ms. Perkins took her concerns to Mr. Karstens the morning of February 22, 2016.[25] DSMF ¶ 57; PRDSMF ¶ 57. On February 22, 2016, Ms. Perkins

---

[24] The Plaintiffs' deny the Defendant's statement that "Gordon's calendar reflected that she was scheduled to be on vacation the week of February 22, 2016," DSMF ¶ 54; stating that Ms. Gordon's calendar shows 'Kayla-out' but Ms. Gordon had several meetings scheduled. PRDSMF ¶ 54. The Court views this matter as a factual dispute and is required to view disputed facts in the light most favorable to the Plaintiffs. The Court included the Plaintiffs' paragraph fifty-four.

[25] The Plaintiffs interpose a qualified response to the Defendant's statement: "at 11:37 AM on February 22, 2016 Karstens sent Perkins an email questioning plaintiffs' honesty and time and attendance records. *See Pl.'s Ex.* 4, *Bates #C&GDEF000506* ('Another thing is I caught her in a lie

19

was not aware of Ms. Gordon and Ms. Cole's complaints against Mr. Karstens. DSMF ¶ 58; PRDSMF ¶ 58. Mr. Karstens and Ms. Perkins reviewed past timesheets for Ms. Gordon and Ms. Cole and learned that they had been approving each other's timesheets.[26] DSMF ¶ 59; PRDSMF ¶ 59. Based on her "Managing in State Government" supervisory training, Ms. Perkins understanding was that it was not appropriate for co-workers to be approving each other's timesheets. DSMF ¶ 60; PRDSMF ¶ 60.

Mr. Karstens contacted CIO Smith the morning of February 22, 2016, and he reported the concerns regarding the timesheets. DSMF ¶ 61; PRDSMF ¶ 61. Mr. Karstens and Sandy Saunders, the Director of Communications, then reviewed Ms. Gordon's and Ms. Cole's past calendars and emails.[27] DSMF ¶ 62; PRDSMF ¶ 62. Mr. Karstens and Ms. Saunders discovered that Ms. Gordon's and Ms. Cole's calendars contained regular weekly or bi-weekly meetings, scheduled with Outlook invitations to Ms. Gordon, Ms. Cole, and Male Employee, beginning October 16, 2015, for meetings at Ms. Gordon's house for one- to five-hour blocks during workdays related to the subject "AW." DSMF ¶ 63; PRDSMF ¶ 63. Mr. Karstens also discovered

about Dave's rate. . . .'). PRDSMF ¶ 57. The Court does not view Plaintiffs' qualification as responsive to the Defendant's statement and declines to include it.

[26] The Defendants cite Paragraph 19 of Ms. Perkins' Declaration, as well as Paragraph 27 of Mr. Karstens' Declaration, as support for this statement. DSMF ¶ 59. The Plaintiffs' deny the statement, stating: "Karstens and Perkins had known since February 17, 2016 that plaintiffs had been "alternate approvers" of timesheets." PRDSMF ¶ 59. The Plaintiffs also object to the Defendant's statement on hearsay grounds. The Plaintiffs' basis for denial is non-responsive to the Defendant's statement, and the Court accepts the Defendant's statement. The Court overrules the Plaintiffs' objection to Stipulated Record pages 433 and 434, which the Plaintiffs contend are inadmissible hearsay. Pages 433 and 434 of the Stipulated Record are screenshots of timesheet reports admissible under the business records exception to the hearsay rule. *Stip. Rec.* at 433-34; FED. R. EVID. 803(6)(A).

[27] The Plaintiffs interpose a qualified statement: "Karstens had already reviewed email between the 'male employee' and plaintiff at the time." PRDSMF ¶ 62. This qualification fails to directly address the Defendant's statement and the Court rejects it.

that several meeting invitations were subsequently cancelled through Outlook, both retroactively and prospectively, after Mr. Karstens, Ms. Perkins, and Ms. Saunders reported Ms. Gordon's and Ms. Cole's time issues to Human Resources.[28]  DSMF ¶ 64; PRDSMF ¶ 64.  Most of the meetings were cancelled before February 22, 2016, the date of Mr. Karstens' alleged discovery.  DSMF ¶ 64; PRDSMF ¶ 64.

Though Mr. Karstens also discovered that Ms. Gordon did not record vacation time on her timesheet for the payroll period ending January 2, 2016, Ms. Gordon worked on December 21 and 22, 2015, and attended a work holiday lunch on the December 22, 2015.  DSMF ¶ 67; PRDSMF ¶ 67.  Ms. Gordon took December 23, 2015 as a sick day, December 24, 2015 as Administrative Leave, and December 25, 2015 as Holiday Pay. [29]  DSMF ¶ 67; PRDSMF ¶ 67.  Both Ms. Perkins and Mr. Karstens believed that Ms. Gordon was on vacation during that period, visiting her sister in the Carolinas.  DSMF ¶ 68; PRDSMF ¶ 68.  According to OIT computer records relied on by State EEO Officer Laurel Shippee during the investigation of Ms. Gordon, Ms.

---

[28]    The Plaintiffs' interpose a two-part qualification.  The first part states: "most of the meetings were canceled before Karstens' alleged 'discovery' on February 22, 2016."  PRDSMF ¶ 64 (citing *Stip. R.* at 368-83). The dates that meetings were canceled is a factual dispute, and, under the summary judgment rubric, the Court must view factual disputes in the light most favorable to the non-movant. The Court included the Plaintiffs' qualification.

The second part of Plaintiffs' qualification states: "and all of them were canceled before plaintiffs were informed they were under investigation on February 29, 2016." PRDSMF ¶ 63 (citing *Stip. R.* at 494-95).  The record citation does not support the Plaintiffs' statement, and the Court accordingly rejects it.

[29]    The Defendant states: "Karstens also discovered that Gordon did not record vacation time on her timesheet for the payroll period ending January 2, 2016." DSMF ¶ 67 (citing *Karstens' Dep.*, 44:7-46:16, and *Stip. R.* at 129-130, 437).  The Plaintiffs' interpose the following qualified statement: "Gordon worked on 12/21/15 and 12/22/15 and attended a work holiday lunch on 12/22.  December 23 was taken as a sick day, December 24th as Administrative Leave, and 12/25/16 as Holiday Pay." PRDSMF ¶ 67.  The dates that Ms. Gordon worked are a factual dispute, which the Court is required to view in the light most favorable to the non-movant.  The Court amends the Defendant's statement accordingly.

Gordon did not log onto the State computer system between December 22, 2015 and December 29, 2015; however, an email Ms. Gordon sent using the state system on December 22, 2015 is not reflected in these records.[30]  DSMF ¶ 69; PRDSMF ¶ 69.

Mr. Karstens also discovered that in November 2015, Ms. Gordon wrote to Human Resources to request a waiver of maximum vacation accruals for her and for Ms. Cole, stating that she and Ms. Cole were working on high-profile Business Process Management projects, as well as assuming some additional job duties, and could not take vacation time until at least after the first of the year.[31]  DSMF ¶ 70; PRDSMF ¶ 70.  At the time Ms. Gordon made the request, she was working for Doug Birgfeld.[32]  DSMF ¶ 71; PRDSMF ¶ 71.

---

[30]  The Defendant states in paragraph 69: "According to OIT computer records relied on by the State EEO Officer, Laurel Shippee, during the investigation of Gordon, Gordon did not log on to the State computer system between December 22, 2015, and December 29, 2015." DSMF ¶ 69 (citing *Shippee's Decl.* (ECF. No. 28-3)).  The Plaintiffs interpose a qualified response: "the OIT records relied upon by Shippee likely came from or were manipulated by Karstens, who can't explain why an email Gordon sent using the state system on December 22, 2015 is not reflected." PRDSMF ¶ 69 (citing *Karstens Dep.* at 147; *Stip R.* 155; *see also Pls.' Resp.,* Attach. 5 *Karstens "there will be no investigation of me" email* (ECF No. 39-5)).  The record citations support the Plaintiffs' statement that Mr. Karstens declined to explain why an email Ms. Gordon sent using the state system on December 22, 2015 is not reflected, but the citations do not support the remainder of the Plaintiffs' qualification.  The Court has adjusted the Defendant's statement to reflect the portion of the qualification supported by evidence, and rejects the remainder of the Plaintiffs' qualification.

[31]  The Plaintiffs' interpose a qualified response, stating: "Karstens knew from 'digging in' to the male employee's email (citing Attach. 4 (ECF No. 39-4) that Cole had originally requested lifting the vacation accrual max due to extra job duties and as a result her supervisor asked Gordon to find out how." DSMF, Attach. 4 *Decl. of Karstens* (ECF No. 28-1) (*Karstens Decl.*).  Plaintiff's Ex. 4 does not support the Plaintiffs' statement regarding the basis of Mr. Karsten's knowledge of Ms. Cole's request. The Court rejects Plaintiffs' qualification.

[32]  Defendant's paragraph 71 states: "Karstens knew that fact to be false given his position as then Director of Business Development." *Karstens Decl.* ¶ 34.  Plaintiffs deny the Defendant's paragraph 71, stating: "at the time the request was made, Gordon was working for Doug Birgfeld." *Pls.' Resp.,* Attach. 7 (ECF No. 39-7).  The Plaintiffs further contend: "the stated reasons were true," citing *Pls.' Resp.,* Attach. 1 (ECF No. 39-1), as well as "Pls.' Ex. 22", which is not in the record, and "Cole's Declaration", which is also not in the record.  Based on the conflicting facts in Mr. Karstens' and Ms. Gordon's declarations, there is a factual dispute as to Ms. Gordon's and Ms. Cole's job responsibilities and whether they warranted a waiver of maximum vacation accruals.  The Court must view factual disputes in the light most favorable to the non-movants.  The Court omitted Defendant's paragraph 71 from the statement of facts, and included the Plaintiffs' statement.

On February 23, 2016, Ms. Perkins contacted Ms. Beaudoin to schedule a meeting to discuss the timesheet and calendar discoveries involving Ms. Cole and Ms. Gordon. DSMF ¶ 101; PRDSMF ¶ 101. On February 24, 2016, Mr. Karstens, Ms. Perkins, and Ms. Saunders met with Ms. Beaudoin and presented the information they had discovered regarding Ms. Gordon's and Ms. Cole's timesheets and calendars. DSMF ¶ 102; PRDSMF ¶ 102.

On February 29, 2016, Ms. Gordon and Ms. Cole were each notified that they were being placed under investigation for (1) falsifying time and attendance for themselves and others; (2) providing false justification for waiving maximum vacation accrual limits; and (3) inappropriately using time and other State resources for personal business. DSMF ¶ 108; PRDSMF ¶ 108. Male Employee was not investigated because he was no longer employed by the State.[33] DSMF ¶ 109; PRDSMF ¶ 109. Had Male Employee still been employed by OIT after February 22, 2016, he would have been placed under investigation, along with Gordon and Cole, for inappropriately using time and other State resources for personal business.[34] DSMF ¶ 110; PRDSMF ¶ 110. OIT also considered whether to take action against the contractors, both male and female, who were included in some of the meeting

---

[33] The Plaintiffs' deny the Defendant's paragraph 109, citing Plaintiffs' Exhibit 12, which is an email from Jim Smith to Laurel Shippee asking for a periodic update "on the two investigations, Kayla and Terry, and D" (rest of name is redacted). *PRDSMF*, Attach. 10 *Three Investigations* (ECF No. 39-10). "Karstens knew since September 3, 2015, that Gordon and the "male employee" were working together on an outside company but it wasn't until plaintiffs reported harassment and blew the whistle on the Pega Enterprise Contract did suddenly it become a concern." PRDSMF ¶109; *Stip R.* at 330-332. The Plaintiffs' statement is non-responsive to the Defendant's paragraph 109, and the Court overrules the denial.

[34] The Plaintiffs deny the Defendant's paragraph 110, citing Exhibit 12 as evidence. PRDSMF ¶ 110. Exhibit 12 does not contradict the Defendant's paragraph 110. The Court overrules the Plaintiffs' denial.

invitations for "AW" meetings. DSMF ¶ 111; PRDSMF ¶ 111. After conducting an initial review, however, it was determined that it did not appear that the contractors charged their time for attending "AW" meetings. DSMF ¶ 112; PRDSMF ¶ 112.

On February 22, Ms. Beaudoin told Mr. Smith she had spoken to Ms. Cole and "there is more to the story." PSAMF ¶ 167; DRPSAMF ¶ 167. On or about February 22, 2016, Mr. Smith authorized Mr. Karstens to lock the Plaintiffs out of the state computer system and collect evidence against them.[35] PSAMF ¶ 168; DRPSAMF ¶ 168. CIO Smith gave his authorization in consultation with Human Resources, after Mr. Karstens had gone to him on February 22, 2016 with the initial information that Ms. Perkins, Ms. Saunders, and he had discovered regarding Plaintiffs' possible falsification of time and attendance records. PSAMF ¶ 168; DRPSAMF ¶ 168. On February 23, 2016, Ms. Saunders expressed her concern to Mr. Smith that Ms. Gordon and Ms. Cole were working to clean up their email and she stated that she thought it would be a good idea to get permission from Human Resources to get access to their email. PSAMF ¶ 168; DRPSAMF ¶ 168. Mr. Karstens spent hours on the evenings of Monday, February 22, and Tuesday, February 23, creating spreadsheets and compiling evidence against the Plaintiffs, which he later gave to Ms. Beaudoin

---

[35] The Defendant interposes a qualified response to the Plaintiffs' paragraph 168: "CIO Smith gave his authorization, in consultation with Human Resources, at some point after Karstens went to him on February 22 with the initial information that Perkins, Saunders, and he had discovered regarding plaintiff's possible falsification of time and attendance records. On February 23 2016, Saunders expressed her concern to Smith that Gordon and Cole were working to clean up their email and stated that she thought it would be a good idea to get permission from Human Resources to get access to their email. *Stip R.* at 314." DRPSAMF ¶ 168. The Defendant's qualification does not directly contradict the Plaintiffs' statement, instead it adds detail and context. The Court amended Plaintiffs' paragraph 168 to reflect this context.

and/or Ms. Shippee.[36]  PSAMF ¶ 169; DRPSAMF ¶ 169.  On February 23, 2016 at 3:31 a.m., Ms. Gordon told Ms. Beaudoin "this is one of the hardest things I have ever had to do in my career—this is very stressful" and that she and Ms. Cole had a "concern with Jim's ability to make the best decision for Kayla's safety."  PSAMF ¶ 170; DRPSAMF ¶ 170.  On February 23, 2016, Ms. Beaudoin met with Mr. Smith, who told her "Josh has been going through emails" and mentioned a "smoking gun" related to Agile Wave, and that Kayla and Terry "missupp" and "falsify t+a."  PSAMF ¶ 172; DRPSAMF ¶ 172.  On February 23, 2016, at 7:52 PM, Mr. Karstens told Mr. Smith he had "cross checked the TAMS for Kayla and Terry" and found 29 instances where they allegedly scheduled meetings for Agile Wave and falsified TAMS.  PSAMF ¶ 173; DRPSAMF ¶ 173.  On February 23, 2016, at 10:20 PM, Mr. Karstens forwarded his research to Ms. Perkins.  PSAMF ¶ 174; DRPSAMF ¶ 174.

Between February 24 and February 25, 2016, OIT employee Mark T. told Ms. Beaudoin via email that Ms. Gordon is "not dramatic" and "not in her nature to be spooked" but that Mr. Karstens' behavior was causing her to be physically ill and that she was afraid to even see his truck.[37]  PSAMF ¶ 175; DRPSAMF ¶ 175.  Mark T. also told Ms. Beaudoin that he personally observed Mr. Karstens where a "stiff,

---

[36]     The Defendant interposes a qualified response to the Plaintiffs' paragraph 169, contending that Mr. Karstens only began looking into the Plaintiffs' emails and calendars after Ms. Perkins raised concerns.  PSAMF ¶ 169.  The Defendant further states that Ms. Saunders also looked into the matter further.  DRPSAMF ¶ 169.  The qualified response does not directly contradict the Plaintiffs' statement, and the Court overrules it as non-responsive.

[37]     The Defendant objects to this statement on the ground that it is hearsay.  DRPSAMF ¶ 175. The Court disagrees.  Mr. T.'s observations about how Ms. Gordon was reacting to Mr. Karstens are not hearsay, because they are Mr. T.'s own direct observations and within his personal knowledge. Mr. T.'s recollection of Ms. Gordon's statements to him are not hearsay because they are prior consistent statements from Ms. Gordon, whose credibility has been questioned by the Defendant.  FED. R. EVID. 801(d)(1)(B).

argumentative, almost belligerent aura comes over him, almost like a hum radiating through him".[38]  PSAMF ¶ 176; DRPSAMF ¶ 176.

### E.  OIT's Investigation

On February 24, 2016, Mr. Smith told Ms. Shippee or Ms. Beaudoin that "based on the emails and calendar entries, it is time to talk to Joyce and Legal about a criminal investigation." PSAMF ¶ 177; DRPSAMF ¶ 177.  On February 29, 2016 at 8:37 AM, Mr. Karstens told Ms. Beaudoin and Ms. Shippee "Cole is contacting staff to try to determine what is going on.  You ok with me informing them that if she or Terry calls for them to just inform her to contact myself or Cassandra Perkins?" PSAMF ¶ 178; DRPSAMF ¶ 178.  On February 29, 2016, at 9:27 a.m., Mr. Karstens told Ms. Beaudoin and Ms. Shippee that he received no requests from the Plaintiffs for time off on February 17 and February 18.  PSAMF ¶ 179; DRPSAMF ¶ 179.  On

---

[38]     The Plaintiffs' paragraph 176 states, "Mark T. told Beaudoin he personally observed Karstens in meetings "where a stiff, argumentative, almost belligereyffmyynt [sic] aura comes over him, almost like a hum radiating through him" and his responses to Ms. Cole seemed retaliatory and were escalating.  PSAMF ¶ 176.  The Defendant interposes a qualified response to the Plaintiffs' paragraph 176, stating that the email does not refer to Mr. Karstens' responses to Ms. Cole: "[Ms. Gordon] states she was helping a co-worker with something and Josh's responses, which seemed retaliatory, were escalating. *Stip R.* at 568." DRPSAMF ¶ 176.  Whether Ms. Gordon meant Ms. Cole when referencing a co-worker in her conversation with Mark T. is a question of fact, and the Court must view factual disputes in the light most favorable to the non-movant.  The Court rejects the Defendant's qualification.
      The Defendant also objects to the Plaintiffs' paragraph 176 on hearsay grounds.  The Plaintiffs filed a response to the Defendant's request to strike, arguing that the Plaintiffs' paragraph 176 should be admitted, because it is being offered to show the reputations of Ms. Gordon and Mr. Karstens, not the truth of the matter asserted.  *Pl.'s Local Rule 56(e) Resp. to Def.'s Requests to Strike and Correction* (ECF No. 49).  The Plaintiffs miscite the correct rule of evidence, referring to Rule 804(21), instead of Rule 803(21).  *See id.* at 1.  The Court disagrees with the Plaintiffs that Mr. T.'s observations of Mr. Karstens constitute proper reputation evidence.  As the advisory committee noted, Rule 803(21) only addresses whether reputation evidence is hearsay, but such evidence must still conform to other rules of evidence, including Rules 404 and 608.  FED. R. EVID. 803(21) advisory committee's note to 1972 proposed rules.  This evidence, to the extent it is reputation evidence, would not be admissible under either Rule 404 or Rule 608.  Even so, the Court concludes that Mr. T.'s personal observations of Mr. Karstens are not hearsay and are admissible because Mr. T.'s statements are based on his own observations of Mr. Karstens.  The Court DENIES the Defendant's request to strike Plaintiff's paragraph 176 on hearsay grounds.

February 29, 2016, at 10:05 a.m., Ms. Gordon told Ms. Beaudoin, "my state email has been suspended I feel vulnerable and like I'm being retaliated against." PSAMF ¶ 180; DRPSAMF ¶ 180. On February 29, 2016, at 10:21 a.m., Ms. Shippee told Ms. Beaudoin that until the notice of investigation went out to Ms. Cole and Ms. Gordon, calls from Ms. Cole "can be referred to Josh."[39] PSAMF ¶ 181; DRPSAMF ¶ 181.

On February 29, 2016, at 10:42 a.m., Ms. Beaudoin told Mr. Karstens, "I will be changing Terry's time once I get updated information from you. Is Kayla's time okay as reported?"[40] PSAMF ¶ 182; DRPSAMF ¶ 182. Underlying Ms. Beaudoin's comment was initial confusion as to whether Ms. Cole and Ms. Gordon had worked on February 17 and 18 or whether they had called in sick. PSAMF ¶ 182; DRPSAMF ¶ 182. Ms. Beaudoin contacted Ms. Gordon by email on February 29, 2016 to determine her status on those dates. PSAMF ¶ 182; DRPSAMF ¶ 182. Ms. Gordon had trouble remembering whether she had actually worked on those dates. PSAMF ¶ 182; PRDSMF ¶ 182. Based on her communications with Ms. Gordon, Ms. Beaudoin agreed to adjust the timesheet in Ms. Gordon's favor. PSAMF ¶ 182; DRPSAMF ¶ 182. In any event, the time and attendance records and calendar entries for February

---

[39]     The Plaintiffs' paragraph 181 states that on February 29, 2016, Ms. Shippee told Ms. Beaudoin that calls from Ms. Cole "can be referred to Josh." PSAMF ¶ 181. The Defendant interposes a qualified response: Ms. Shippee stated the importance of getting the notices of investigation out to Plaintiffs as soon as possible, and that in the meantime, calls can be referred to Josh." DRPSAMF ¶ 181. The Plaintiffs' statement is misleading without the Defendant's clarification, and the Court adjusts paragraph 181 accordingly.
[40]     The Defendant interposes a qualified response to the Plaintiffs' paragraph 182, stating that there was confusion regarding whether Ms. Cole and Ms. Gordon worked on February 17 and 18 or whether they called out sick, leading Ms. Beaudoin to communicate with Ms. Gordon on February 29 to determine whether she worked. DRPSAMF ¶ 182. The Defendant notes that Ms. Gordon had difficulty recalling whether she worked on those dates. *Id.* Based on her conversation with Ms. Gordon, Ms. Beaudoin agreed to adjust Ms. Gordon's timesheet in her favor. *Id.* The Defendant's qualified response provides context to the Plaintiffs' paragraph 182, and the Court included it.

17 and 18 were not the subject of the personnel investigations. PSAMF ¶ 182; DRPSAMF ¶ 182. At 10:54 a.m. on February 29, 2016, Mr. Karstens asked Ms. Beaudoin, "Did you get the email I sent explaining the sick time and the time she was out of the office without any notification." PSAMF ¶ 183; DRPSAMF ¶ 183.

Ms. Cole was on medical leave from March 7, 2016, through June 17, 2016. DSMF ¶ 113; PRDSMF ¶ 113. Ms. Gordon was on medical leave from February 19, 2016 through June 19, 2016. DSMF ¶ 114; PRDSMF ¶ 114. Both Ms. Cole and Ms. Gordon were placed on paid administrative leave effective June 20, 2016. DSMF ¶ 115; PRDSMF ¶ 115. The State EEO Officer, Laurel Shippee, was assigned to conduct the investigation of the allegations against Ms. Gordon and Ms. Cole. DSMF ¶ 116; PRDSMF ¶ 116. Human Resources manager Doreen Brown was assigned to conduct the investigation of Ms. Cole's and Ms. Gordon's complaints against Mr. Karstens. DSMF ¶ 117; PRDSMF ¶ 117.

On March 23, 2016, Ms. Beaudoin wrote to Ms. Gordon and Ms. Cole and asked whether they would be willing to be interviewed while on medical leave regarding their complaints against Mr. Karstens. DSMF ¶ 118; PRDSMF ¶ 118. Ms. Gordon's and Ms. Cole's union representative advised Ms. Shippee that Ms. Gordon and Ms. Cole were unwilling to be interviewed while on medical leave regarding their complaints against Mr. Karstens.[41] DSMF ¶ 119; PRDSMF ¶ 119. Ms. Shippee

---

[41] The Plaintiffs interpose a qualified response to the Defendant's paragraph 119, stating: "the April 21, 2016 communication about plaintiffs' meetings with Shippee was one among many—amid a context of plaintiffs' reported concerns about retaliation and fear of Josh Karstens. *Stip R.* at 473 ("Both Terry and Kayla have concerns about their safety. . . They feel that, having reported their concerns about Mr. Karstens behavior both in and out of the workplace, they have been made more vulnerable"). *See Pls.' Ex.* 13; *Bates # C&GDEF000973-974* (plaintiffs through union report concerns on 3/11/16 about retaliation to HR Manager Beaudoin); *Bates # C&GDEF0001338* (4/7/16 plaintiffs

subsequently interviewed Ms. Gordon and Ms. Cole at least five times each with respect to the allegations against them. DSMF ¶ 121; PRDSMF ¶ 121. During at least one of those interviews, Ms. Shippee asked Ms. Gordon and Ms. Cole whether they would agree to be interviewed regarding their complaints against Mr. Karstens. DSMF ¶ 122; PRDSMF ¶ 122.

Ms. Gordon and Ms. Cole filed a joint discrimination charge with the Maine Human Rights Commission on June 20, 2016. DSMF ¶ 120; PRDSMF ¶ 120. On June 21, 2016, Ms. Beaudoin wrote Ms. Gordon and Ms. Cole to schedule interviews with Ms. Brown and Ms. Shippee for June 27, 2016, regarding their complaints against Mr. Karstens. DSMF ¶ 123; PRDSMF ¶ 123. Ms. Gordon and Ms. Cole, through their attorney, declined to be interviewed regarding their complaints.[42] DSMF ¶ 124; PRDSMF ¶ 124.

---

express willingness to be interviewed); and *Bates # C&GDEF001338* (plaintiffs inquire about interviewing them on 6/14/16); *Also see Stip. R.* 477 ("HR's intention is not to complete the investigation into your complaint about JK before interviewing you about the vacation accrual waiver")."

    Even though the Plaintiffs cite Ms. Cole's and Ms. Gordon's safety concerns, they present no evidence that these safety concerns were the reason for their refusal to participate in either investigation while on medical leave. Furthermore, the qualification does not directly contradict the Defendant's paragraph 119. The Court rejects the Plaintiffs' qualification.

[42]     The Plaintiffs interpose a qualified response to the Defendant's paragraph 124, stating that "when Shippee finally attempted to schedule an interview in June of 2016 to interview the plaintiffs about their allegations, Mr. Karstens claims he had twice been told there would be no investigation of him." *PRDSMF*, Attach. 5 *Karstens 'there will be no investigation of me' email* (ECF No. 39-5). "Shippee questioned whether there would even be an investigation (*PRDSMF*, Attach. 12 "*Shippee on investigation*" (ECF No. 39-12)) and plaintiffs had already filed their Charge of Discrimination with the Human Rights Commission. DSMF ¶ 120. The Court declines to adopt the first part of Plaintiffs' qualification because the Plaintiffs failed to explain why the status of the investigation is dispositive as to whether Ms. Cole and Ms. Gordon refused to be interviewed regarding their complaints against Mr. Karstens. Similarly, the Plaintiffs' qualification that they had already filed their Charge of Discrimination with the Human Rights Commission is not responsive to the Defendant's paragraph 124, and the Court rejects it.

In conducting the investigations of Ms. Cole and Ms. Gordon, Ms. Shippee interviewed at least thirteen witnesses in addition to Ms. Cole and Ms. Gordon. DSMF ¶ 125; PRDSMF ¶ 125. CIO Jim Smith was not interviewed as part of the investigations of Ms. Cole or Ms. Gordon. DSMF ¶ 126; PRDSMF ¶ 126. Ms. Shippee completed the investigation of Ms. Gordon and issued a report on September 15, 2016, substantiating all three allegations against her. DSMF ¶ 127; PRDSMF ¶ 127. Ms. Shippee found Ms. Gordon's responses not credible during the investigation.[43] DSMF ¶ 130; PRDSMF ¶ 130.

On June 21, 2016, Ms. Shippee told Mr. Smith that it was not appropriate for her to be communicating with Mr. Karstens about the investigation since he is a witness.[44] PSAMF ¶ 187; DRPSAMF ¶ 187. On September 23, 2016, Mr. Karstens

---

[43] The Plaintiffs interpose a qualified response, indicating that Ms. Shippee refused to let them review the documents that she was relying on when questioning them, nor did she disclose that the records were created or provided to her by Mr. Karstens. *See* PRDSMF ¶ 130. The Plaintiffs further contend that the Maine Department of Labor Administrative Hearing Officer found Ms. Gordon very credible. *See PRDSMF*, Attach. 6 *Gordon Unemployment Decision* (ECF No. 39-6). The Plaintiffs' qualified response asserts details about the basis of Ms. Shippee's decision, and provides an example of Ms. Gordon being found credible by another judicial officer. *See* PRDSMF ¶ 130. However, the Defendant's paragraph 130 does not assert the basis of Ms. Shippee's decision, only that she made it. It also does not discuss the officer's credibility finding in Ms. Gordon's unemployment decision. The Court declines to include additional facts not directly responsive to the Defendant's statement and found only in the Plaintiffs' response to the Defendant's statement of material facts.

    Whether Ms. Shippee's credibility determination is otherwise admissible is not before the Court and the Court expresses no view on the question.

[44] Citing page 582 of the stipulated record, the Plaintiffs' paragraph 54 states "on June 21, 2016, after months of directly communicating with Karstens, Shippee told Smith, "Jim—it's not appropriate for me to be communicating with Josh about the investigation since he is a witness." PSAMF ¶ 187. The Defendant interposes a qualification, stating that prior to June 21, 2016, Mr. Karstens was communicating with Ms. Shippee to provide information regarding the allegations under investigation, whereas on June 21, 2016, Mr. Karstens was inquiring about the status of the investigation. DRPSAMF ¶ 187. The Plaintiffs' paragraph 54 offers no support for their contention that Ms. Shippee's communication with Mr. Smith took place "after months of communicating directly with Karstens." PSAMF ¶ 187. The Court omitted this phrase from Plaintiffs' paragraph 187.

told Ms. Shippee he wanted to start the process to replace the Plaintiffs and retrieve state equipment in their possession.[45] PSAMF ¶ 171; DRPSAMF ¶ 171.

Ms. Shippee completed the investigation of Ms. Cole and issued a report on October 4, 2016, substantiating the allegations that Ms. Cole falsified time and attendance for others and inappropriately used time and other State resources for personal business.[46] DSMF ¶ 128; PRDSMF ¶ 128. Ms. Shippee did not substantiate the allegations against Ms. Cole that she falsified her own time and attendance or that she provided false justification for waiving maximum vacation accrual limits. DSMF ¶ 129; PRDSMF ¶ 129. Ms. Shippee found Ms. Cole's responses not credible with regard to the allegation that Ms. Cole allowed others to falsify their time and the allegation that Ms. Cole inappropriately used State time and resources.[47] DSMF

---

[45]    The Defendant denies the Plaintiffs' paragraph 171, first stating that the email is dated September 23, 2016. DRPSAMF ¶ 171. The Court has made the correction. The Defendant further states that in response to Mr. Karstens' statement, he was told that one investigation had not yet been finalized, and the other was not yet completed. The Defendant states that it was Mr. Smith, not Mr. Karstens, who made the decisions regarding disciplinary action of the Plaintiffs. The Defendant's denial is not directly contradictory to the Plaintiffs' paragraph 171, and is overruled as non-responsive.

[46]    The Plaintiffs interpose a qualified response, stating: "Shippee relied in great part on information and alleged "records" supplied by Karstens, a biased witness, when she knew plaintiffs had not "approved" each other's time sheets on February 16, 2016 before Kayla left for vacation." PRDSMF ¶ 128. The Plaintiffs mischaracterized Ms. Shippee's Investigation Report. *Stip R.* at 440-449. According to the report, Mr. Karstens told Ms. Shippee that "AA [Ms. Cole] [] signed Ms. Gordon's timesheet for the time Gordon is alleged to have taken vacation and reported work time." *Id.* at 441. Ms. Shippee substantiated Mr. Karsten's allegation in her report. Not substantiated in Ms. Shippee's report was the claim that Ms. Gordon signed another employee's timesheet. *Stip. R.* at 441. The report does not state that Mr. Karstens made a claim that the Plaintiffs approved each other's time sheets, nor were any of his statements unsubstantiated in the investigation. *Id.* at 440-449; 451-457.

[47]    The Plaintiffs interpose a qualification to the Defendant's paragraph 131, indicating that Ms. Shippee's finding is based on information provided to her by Mr. Karstens, and claiming that Ms. Shipee knew at the time she wrote the report that Ms. Cole and Ms. Gordon had signed their own timesheets and submitted them to payroll for approval. As discussed above, the record does not reflect that Mr. Karstens falsely told Ms. Shippee that Ms. Cole "approved" Ms. Gordon's timesheet in December 2015. *See supra* n. 34. Moreover, the Defendant's statement only indicates that Ms. Shippee found Ms. Cole's responses not credible, not her basis for doing so. The Plaintiffs' qualification is not responsive to the Defendant's paragraph 131 and the Court declines to include it.

¶ 131; PRDSMF ¶ 131.  Ms. Shippee found Ms. Gordon's responses not credible during the investigation.[48]  DSMF ¶ 135; PRDSMF ¶ 135.

Following the investigation, Mr. Smith recommended what level of discipline against Ms. Gordon and Ms. Cole was appropriate.[49]  DSMF ¶ 132; PRDSMF ¶ 132. Mr. Smith initially recommended that both Ms. Gordon and Ms. Cole be terminated. DSMF ¶ 133; PRDSMF ¶ 133.  Ultimately, OIT, Ms. Cole, and Ms. Cole's union agreed that in lieu of termination, a two-week unpaid suspension would be served from December 12, 2016 to December 23, 2016.  The agreement states that Ms. Cole admitted no wrongdoing and she reserved her right to pursue claims of harassment and retaliation.[50]  DSMF ¶ 134; PRDSMF ¶ 134.

---

[48]    The Plaintiffs interpose a qualified response, indicating that Ms. Shippee refused to let the plaintiffs review the documents that she was relying on when questioning plaintiffs, nor did she disclose that the records were created or provided to her by Mr. Karstens.  *See* PRDSMF ¶ 130.  The Plaintiffs further contend that the Maine Department of Labor Administrative Hearing Officer found Ms. Gordon very credible.  *See* PRDSMF, Attach. 6 *Gordon Unemployment Decision* (ECF No. 39-6). This is the same objection the Court discussed in footnote 46 and the result is the same.

[49]    The Defendant's paragraph 132 states: "Following the investigation, the CIO relied on Shippee's findings and recommended what level of discipline against Gordon and Cole was appropriate."  DSMF ¶ 132.  The Defendant's citations to the stipulated record and to Mr. Smith's Declaration, however, only partially support the statement.  Nowhere in the cited record does it say that Mr. Smith relied on Ms. Shippee's findings to support his recommended disciplinary action.  The Court omits the unsupported portion of the Defendant's paragraph 132.

The Plaintiffs interpose a qualified response, stating: "Smith and Karstens pressured Shippee and made it clear they expected plaintiffs to be fired before an investigation was completed."  PRDSMF ¶ 132.  The Plaintiffs cite an email exchange between Mr. Smith and Ms. Gordon as support for the qualification.  However, the email exchange in Exhibit 19 does not support the contention that Mr. Smith or Mr. Karstens made it clear that the Plaintiffs should be terminated.  In the email discussion in Exhibit 19, Mr. Karstens and Mr. Smith discuss moving Ms. Gordon into another department pending the outcome of the investigation against Mr. Karstens, but there is no evidence of a discussion of termination in Exhibit 19.  PRDSMF, Attach. 17 *Gordon Unemployment Decision* (ECF No. 39-6). The Court declines to include the Plaintiffs' qualification.  *See* PRDSMF, Attach. 6 *Beaudoin "punitive" Email* (ECF No. 39-6).

[50]    The Plaintiffs interpose a qualification, stating that the agreement admits no wrongdoing and reserves her rights to pursue claims of harassment and retaliation.  *Stip. R.* at 468-69. While not directly contradictory to the Defendant's paragraph 134, the Court included the qualification as otherwise the Defendant's statement would be misleading.

A *Loudermill* hearing was scheduled on the proposed termination of Ms. Gordon on September 23, 2016, and DAFS Deputy Commissioner David Lavway presided over the *Loudermill* hearing.[51]  DSMF ¶ 136; PRDSMF ¶ 136.  Ms. Gordon attended the hearing with her union representative.  DSMF ¶ 137; PRDSMF ¶ 137. Following the hearing, Deputy Commissioner Lavway upheld the proposed termination of Gordon's employment, effective September 30, 2016.  DSMF ¶ 138; PRDSMF ¶ 138.

Ms. Cole served her suspension and returned to work on December 27, 2016. DSMF ¶ 139; PRDSMF ¶ 139.  Upon her return to work, Ms. Cole was assigned to a new supervisor, Technology Business Consultant Nathan Willigar, in the chain of command under Associate CIO Victor Chakravarty.[52]  DSMF ¶ 140; PRDSMF ¶ 140. Although Ms. Cole did not have any communication with Mr. Karstens after her return to work, she was assigned to work approximately thirty feet from Mr. Karstens and in his chain of command, making her very uncomfortable.  DSMF ¶ 141; PRDSMF ¶ 141.  Furthermore, Ms. Cole was not given the proper equipment to do her job.  DSMF ¶ 141; PRDSMF ¶ 141.  In addition, her new supervisor made a comment suggesting that her return to work was an unpleasant surprise.  DSMF ¶ 141; PRDSMF ¶ 141.

---

[51]  A *Loudermill* due process hearing is required under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) before certain civil servants may be dismissed from public employment.

[52]  The Plaintiffs interpose a qualification, stating: "Cole was assigned to work approximately 30 feet from Karstens and in his chain of command and felt very uncomfortable and not given the proper equipment to do her job.  In addition, her "new" supervisor made a comment suggesting her return to work was an unpleasant surprise." *Stip. R.* at 69-70.  The Plaintiff's qualification explains her decision to resign from employment in January, 2017 and the Court included it.

Ms. Cole submitted her resignation effective January 18, 2017.[53] DSMF ¶ 142; PRDSMF ¶ 142. Ms. Cole did not give a reason for her resignation at the time she submitted it, but in her exit interview, she stated she felt uncomfortable working in such close proximity to Mr. Karstens and that the State did not address her complaints of harassment and retaliation.[54] DSMF ¶ 143; PRDSMF ¶ 143. Specifically, the handwritten notes of the exit interview state in part: "Jim said they would be on different floors -- he owns this one -- are you kidding? Kelly is not going to like this." DSMF ¶ 143; PRDSMF ¶ 143. Ms. Cole began a new job outside State government on or about January 30, 2017. DSMF ¶ 144; PRDSMF ¶ 144.

## F. The Plaintiffs' Discrimination Claims

According to Ms. Gordon, Mr. Smith discriminated against her when he failed to take her to lunch when she was named Employee of the Month but took Ms. Cole to lunch for a similar occasion. DSMF ¶ 150; PRDSMF ¶ 150. Ms. Gordon does not know if Mr. Karstens discriminated against her but thinks that he discriminated against Ms. Cole by implying that she was "just as smart as a man." DSMF ¶ 151; PRDSMF ¶ 151. According to Ms. Cole, Mr. Karstens discriminated against her when he made a statement to the effect that she was just as smart as a man; when he

---

[53] In response to the Defendant's paragraph 142, the Plaintiffs interpose a qualification: "in her exit interview Cole said she felt uncomfortable working in such close proximity to Karstens and that the state did not address her complaints of harassment and retaliation. Investigative notes say, 'Jim said they would be on different floors—he owns this one—are you kidding? Kelly is not going to like this.'" *See* PRDSMF, Attach. 18 *Cole Exit Interview* (ECF No. 39-18). PRDSMF ¶ 140. The Court included the portion of the handwritten notes of the exit interview that the Plaintiffs cited.

[54] The Defendant's paragraph 143 states, "Ms. Cole did not give a reason for her resignation." *Stip R.* at 69. DSMF ¶ 143. The Plaintiffs interpose a qualified response, citing the reasons for her resignation that Ms. Cole gave in her exit interview. PRDSMF ¶ 143. The Court views the exit interview as part of the resignation process and includes Ms. Cole's qualification.

insinuated to others that Ms. Cole was too friendly with a male contractor, and when he said that he got Ms. Cole her promotion. DSMF ¶ 152; PRDSMF ¶ 152. Mr. Smith never did or said anything inappropriate to Ms. Cole.[55] DSMF ¶ 153; PRDSMF ¶ 153. Ms. Cole never personally witnessed Mr. Smith make any sexual comments. DSMF ¶ 154; PRDSMF ¶ 154. Both Ms. Gordon and Ms. Cole received a copy of the State's Policy Prohibiting Workplace Harassment during their employment and received training on the policy. DSMF ¶ 155; PRDSMF ¶ 155.

## III. THE POSITIONS OF THE PARTIES

### A. OIT's Position

#### 1. The Discrimination Claims

OIT contends that the Plaintiffs' sex discrimination claims under Title VII and the MHRA must fail as the Plaintiffs cannot make a prima facie case of discrimination. *Def.'s Mot.* at 1. OIT says that the Plaintiffs identified four different acts that they say qualify as unlawful discrimination: (1) that Mr. Smith discriminated against Ms. Gordon when he failed to take her to lunch when she was named employee of the month, but did take Ms. Cole to lunch for a similar occasion; (2) that Mr. Karstens discriminated against Ms. Cole when he stated that she was just as smart as a man; (3) that Mr. Karstens further discriminated against Ms. Cole

---

[55] The Plaintiffs interpose a qualified response to the Defendant's statement: "Cole has filed this lawsuit alleging Smith unlawfully discriminated against and retaliated against her." PRDSMF ¶ 153. The Plaintiffs cite Federal Rule of Evidence 201, judicial notice of adjudicative facts.

The Court is confused. To be judicially noticed, the fact must be "not subject to reasonable dispute." FED. R. EVID. 201(b). The Defendant denied the essential allegations in the Plaintiffs' Complaint. *Am. Answer* at 1-10. Controverted allegations in a complaint are hardly the stuff for Rule 201 admissibility. The Court overrules the Plaintiffs' qualified response.

when he insinuated to others that she was too friendly with a male contractor; and (4) that Mr. Karstens discriminated against Ms. Cole when he said that he got Ms. Cole her promotion.

OIT says that the Plaintiffs cannot meet their prima facie case because they cannot establish that they were treated differently from similarly situated men. OIT contends that the Plaintiffs "cannot point to any male employee of OIT who engaged in the same conduct for which Plaintiffs were investigated and disciplined who was treated more favorably." *Id.* at 7. OIT also contends that OIT's disciplinary actions against the Plaintiffs do not meet the definition of "adverse action" for the purposes of a discrimination claim, because the Plaintiffs do not offer minimally sufficient evidence of pretext and discriminatory animus in OIT's actions against the Plaintiffs. *Id.* at 6.

### 2.     The Hostile Work Environment Claims

OIT says that Plaintiffs' hostile work environment claim consists of twenty-two instances of conduct on the part of OIT. *Id.* at 10-12. It argues that the Plaintiffs have not shown, subjectively and objectively, that the conduct of OIT employees was severe and pervasive, as is required to make a prima facie case of a hostile work environment. *Id.* at 9.

OIT says that the Plaintiffs also report an incident in a bar in March 2014, in which Mr. Karstens allegedly made unwanted sexual advances toward Ms. Cole. *Id.* at 12. OIT argues that the incident should not be considered as part of the Plaintiffs' hostile work environment claim because it is barred by the 300-day statute of

limitations outlined in 5 M.R.S. § 4611, and does not meet the definition of a continuing violation, because (1) the incident involved Ms. Cole, but not Ms. Gordon, (2) the incident was not part of a series of discriminatory acts, and (3) "Ms. Cole's awareness and duty to complain about the alleged incident was triggered when she knew or could have formed a reasonable belief that the earlier violations may have been discriminatory", which was in March 2014. *Id.* at 12-13.

OIT further argues that even if the March 2014 incident were considered to determine whether subsequent alleged conduct was based on sex, the Plaintiffs' hostile work environment claim would fail, because the majority of the subsequent conduct alleged was directed generally at both male and female employees. *Id.* at 13. OIT contends that the Plaintiffs cannot prove that the conduct at issue was not "merely tinged with sexual connotations, but actually constituted discrimination because of sex." *Id.*

It reiterates that the conduct does not rise to the level of severe or pervasive, citing examples in caselaw. To support its contention that the conduct was not subjectively offensive, OIT highlights "the fact that Gordon invited Karstens to join her business venture in September 2015 suggests that Gordon did not find Karstens' alleged conduct offensive." *Id.* at 17.

Finally, OIT argues that it is not liable for the actions of its employees because it took reasonable care to promptly respond to the Plaintiffs' complaints, and therefore was not negligent. *Id.*

### 3. The Retaliation Claims

OIT says that the Plaintiffs allege that the investigation and subsequent discipline against them was in retaliation for reporting "unlawful sexual harassment, a hostile work environment, and discrimination and for blowing the whistle on the Pega contract" in violation of the WPA, 26 M.R.S. § 831. *Id*. at 18.

OIT argues that the Plaintiffs cannot establish a causal link between their protected activity and the investigation and resulting disciplinary action, so their claim must fail. *Id*. at 21. OIT highlights the sequence of events that led to the investigation of Ms. Cole and Ms. Gordon, which began with Ms. Perkins' review of their timesheets, which they had signed and submitted one week before the end of the payroll reporting period. *Id*. OIT also notes that there is no evidence in the record that Mr. Karstens was involved in the initial discovery of the timesheet irregularities that led to the investigation. *Id*. According to OIT, without knowledge of protected activity, there can be no causal connection to the alleged adverse action. *Id*. at 23-24 (citing *Medina-Rivera v. MVM, Inc.,* 713 F.3d 132, 140 (1st Cir. 2013)).

To support its contention that no causal link existed, OIT points to the fact that the investigation was conducted by the State EEO Officer, not OIT employees, and that not all allegations against Ms. Cole were substantiated. *Id*. at 24. It also highlights that it considered taking action against other individuals involved in the "AW meetings" as further evidence that the Plaintiffs were not subjected to an adverse action as a result of protected activity. *Id*. at 25.

**B.    The Plaintiffs' Response**

In response, the Plaintiffs first state that the Defendant has not moved for summary judgment on the Plaintiffs' claim under the WPA, 26 M.R.S. § 833. *Pls.' Resp.* at 1. The Plaintiffs then say that "there are questions of material fact related to their WPA claims regarding the Pega Enterprise agreement that preclude summary judgment, so it makes sense the defendant has not moved." *Id.* at 3. The Plaintiffs contend that Mr. Smith had discriminatory motive, evidenced by his dismissal of the Plaintiffs based on "trumped-up de minimis infractions immediately on the heels of them asserting their rights." *Id.* at 4.

With regard to the sex discrimination claim, the Plaintiffs state that Ms. Cole, "a member of a protected group and competent at her job", was "denied equal opportunity to thrive at work because she didn't want a sexual relationship with Karstens." *Id.* The Plaintiffs contend that they have made a prima facie case of sex discrimination, because both "plaintiffs are women, Ms. Gordon was terminated, and Ms. Cole given a two-week suspension, while comparably qualified persons continued to perform their work responsibilities." *Id.* at 7.

The Plaintiffs state: "a reasonable jury could find that Ms. Cole rejected the sexual advances of a drunk, volatile and married supervisor and Ms. Gordon tried to protect her from his wrath." *Id.* at 6. They also contend that a reasonable jury could find Ms. Shippee's investigation so tainted by the discriminatory bias of Mr. Karstens and Mr. Smith that a causal connection exists between Mr. Karstens' and Mr. Smith's discriminatory bias and Ms. Shippee's findings of conduct. *Id.* at 7. In support of their contentions, the Plaintiffs cite *Awugah v. Key Bank, N.A.*, No. 2:12-cv-97-DBH,

2013 WL 950694, 2013 U.S. Dist. LEXIS 33859 (D. Me. Mar. 12, 2013), *Harlow v. Potter,* 353 F. Supp. 2d 109 (D. Me. 2005), and *Cote v. T-Mobile*, 168 F. Supp. 3d 313 (D. Me. 2016). *Id.* at 7. The Plaintiffs also claim that almost all of the information relied upon by Ms. Shippee was provided by Mr. Karstens. *Id.* at 7-8. The Plaintiffs contend that "the temporal proximity between plaintiffs' reports to HR and Karstens' sudden investigation is so close causation can be inferred. *Id.* at 8 (citing *Furhman v. Staples Office Superstore East, Inc.,* 58 A. 3d 1083, 1093 (Me. 2012)). Finally, as evidence of discriminatory animus, the Plaintiffs point to evidence that Mr. Karstens wished to terminate them, and Mr. Smith wanted to engage a criminal investigation. *Id.* at 9.

### C.    OIT's Reply

In its reply, OIT first contends that the Plaintiffs' response does not comply with Local Rule 56(f), because it recites purported statements of facts not included in any of the parties' statements of facts, and are not otherwise supported by record citations, and, with two exceptions, does not contain citations to the parties' statements of facts. *Def.'s Reply* at 1. OIT argues that the Court should not consider any of the facts in the Plaintiffs' response that do not comply with Rule 56. *Id.* at 2.

Second, OIT reiterates that it is entitled to summary judgment on the Plaintiffs' sex discrimination claim because the Plaintiffs have not established their prima facie case, in that they have not established that a similarly situated male employee was treated more favorably. *Id.* OIT also says that the Plaintiffs have not shown that OIT's reasons for taking adverse action were pretextual. *Id.* OIT notes

that the Plaintiffs contend that they have made their prima facie case because "both plaintiffs are women. Gordon was terminated, and Cole was given a two-week suspension while comparably qualified persons continued to perform their work responsibilities." *Pls.' Resp.* at 7. OIT points out that the Plaintiffs have not offered any evidence about "comparably qualified persons." *Id.* at 2-3.

OIT also contends that the Plaintiffs have not shown that they were subjected to a hostile work environment, because Mr. Karstens' behavior was not targeted at the Plaintiffs or at women in general. OIT also says that the Plaintiffs have not established that the conduct was either subjectively or objectively offensive, or severe and pervasive.

With regard to the Plaintiffs' retaliation claims under the WPA and the MHRA, OIT points out that the Plaintiffs were incorrect in their statement that OIT has not moved for summary judgment on these claims. *Id.* at 5. OIT states that it has moved for summary judgment on the Plaintiffs' WPA claim in its entirety. *Id.* OIT clarifies that it has chosen, for purposes of summary judgment, not to dispute the Plaintiffs' good faith belief that the Pega contract was illegal, or that they engaged in protected activity for the purposes of the WPA, because the belief that the reported practice is illegal is sufficient to be protected activity under the WPA, as long as the report is made in good faith. *Id.* (citing *Higgins v. New Balance Athletic Shoe*, Inc., 194 F.3d 252, 261-62 (1st Cir. 1999)). OIT reiterates its earlier contention that the Plaintiffs have not established a causal connection between any protected activity and the adverse action, and pretext has not been established, because the evidence

establishes that OIT's belief that the Plaintiffs engaged in the alleged misconduct was reasonable. *Id.* at 5-7.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once the moving party has supplied this evidence, the non-movant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty

rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## V. DISCUSSION

### A. The Plaintiffs' Response to Defendant's Motion for Summary Judgment

The Defendant raises the procedural issue of whether the factual statements in Plaintiffs' response to its motion for summary judgment are unsupported, failing to comply with Local Rule 56(f). *See Def.'s Reply* at 1-2. Specifically, the Defendant states that the Plaintiffs' brief (1) "recites purported statements of facts that are not set forth in any of the parties' separate statements of material facts and are not otherwise supported by record citations", and (2) with two exceptions, does not contain citations to the parties' statements of facts. *Id.* at 1.

The Defendant argues that Local Rule 56(f) states that "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The Court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." For further support, the Defendant cites *Stark v. Hartt Transp. Systems, Inc.*, 37 F. Supp. 3d 445, 451 (D. Me. 2014). *Def.'s Reply* at 1. The Defendant also contends that "[f]acts recited in the body of a brief, without citation to a statement of material facts, are not cognizable on summary judgment. The court should not be expected to parse [a party's] statement of material facts to

determine whether the untethered facts presented in its brief also appear in its statement of material facts. " *Id.* at 1-2 (citing *O'Brien v. Thunder Bay, Inc.*, 2008 A.M.C. 2625, 2008 WL 4104181, at *7 (D. Me. Aug 28, 2018)). The Defendant avers that "the Court should not consider any facts contained in Plaintiffs' memorandum of law that are not contained in the separate statements of material facts filed by the parties and that are not supported by a citation thereto." *Id.* at 2.

The Court agrees. To survive the Defendant's motion, the non-movant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co.*, 200 F.3d at 2. A number of factual statements in the Plaintiffs' response are not in suitable evidentiary form as they are unsupported by record citations.[56] As such, the Court declines to consider the Plaintiffs' motion to the extent that it is based on unsupported statements of fact.

---

[56]     For example, citing their statements of material fact paragraphs 156 through 161, the Plaintiffs assert:

> It turns out the evidence suggests that they are right-the Pega Enterprise Agreement was procured illegally. There was no RFP nor did the Division of Purchases properly authorize the contract. The Director of Finance for OIT at the time Kirsten Figueroa, knew nothing about the negotiation of the "confidential" Pega Enterprise Agreement and the guy who worked with Jim Smith to seal the secret deal, Doug Averil[l], got a big cushy job at Pegasystems, Inc. shortly afterwards in violation of both the state contract and procurement rules.

*Pls.' Resp.* at 1-2. There is nothing in paragraphs 156 through 161 that supports most of these statements. Kirsten Figueroa is not mentioned in paragraphs 156 through 161 and there is no evidence at all that "shortly afterwards," Mr. Averill "got a big cushy job at Pegasystems." In fact, the statements of fact do not clearly reveal who Doug Averill is, whether he once worked for the State, when he joined Pega Enterprises, the relationship, if any, between CIO Smith and Mr. Averill. If the Plaintiffs have such evidence, they should have put it in their statements of material fact and not engaged in rhetorical arguments based on evidence not before the Court.

These statements and other factual arguments in the Plaintiffs' responsive memorandum fail to comply with Local Rule 56(h)(4), which states that "[the] court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."

The Court outlined the Plaintiffs' contentions in this section but in making its decision, the Court will not consider unsupported statements of fact contained only in the Plaintiffs' legal memorandum.

### B. Timeliness and Exhaustion of Administrative Remedies

An employee alleging discrimination or retaliation "must file an administrative claim with the EEOC or with a parallel state agency before a civil action may be brought." *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009). "When filed with a state agency, the administrative [charge] must be filed within 300 days after the alleged unlawful employment practice occurred." *Id.* at 31 (citing 42 U.S.C. § 2000e–5(e)(1)); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). "Maine antidiscrimination and whistleblower protections laws contain the same administrative exhaustion requirement and 300–day time limitation." *Burnett v. Ocean Properties, Ltd.*, No. 2:16-cv-00359-JAW, 2018 WL 2925126, at *24 (D. Me. June 11, 2018) (citing 5 M.R.S. §§ 4611, 4622).

The Defendant contends that to the extent the Plaintiffs' claims are based on the March 2014 incident in which Mr. Karstens allegedly sexually assaulted Ms. Cole, they must be dismissed because the Plaintiffs did not timely raise and exhaust their claim in administrative proceedings.[57] *Def.'s Mot.* at 12. The Court agrees. The statute of limitations for claims regarding the March 14, 2014 incident ran on Thursday, January 8, 2015. The record reflects that the Plaintiffs filed their complaint with the Maine Human Rights Commission on June 20, 2016, more than fifteen months after the period of limitations expired for the March 2014 alleged

---

[57] In its motion, the Defendant put forth a defense to an anticipated argument from the Plaintiffs that the March 14, 2014 incident falls under the continuing violation exception. *Def.'s Mot.* at 12-13. Despite this argument, the Plaintiffs failed to address the Defendant's claim that the March 2014 incident is time-barred. *Pls.' Resp.* at 1-9. More specifically, even though there are exceptions to the time-bar, the Plaintiffs have not argued that any of the exceptions apply to them. In the absence of an argument from the Plaintiffs, the Court declines to address whether an exception might apply.

incident. *Stip. R.* at 51. The claim is time-barred and the Plaintiffs failed to timely exhaust their administrative remedies. Accordingly, in assessing the merits of the Plaintiffs' claims for summary judgment purposes, the Court does not consider conduct the Plaintiffs allege occurred before January 8, 2015. To be clear, although the Plaintiffs' claims may not be based on the March 14, 2014 incident, the Plaintiffs are not prevented from asserting that the March 14, 2014 incident was a catalyst for claims that do fall within the statute of limitations.

### C.    Retaliation under the Maine Whistleblowers' Protection Act, Title VII, and the Maine Human Rights Act

The Plaintiffs allege that OIT's investigation and subsequent discipline of them was in retaliation for their reporting "unlawful sexual harassment, a hostile work environment and discrimination for blowing the whistle on the Pega contract." (*Compl.* ¶ 52). They claim retaliation specific to the WPA[58] as well as general retaliation under 42 U.S.C. § 2000e-3(a) and the Maine Human Rights Act, 5 M.R.S § 4633.

Under the MWPA, '[n]o employer may discharge or otherwise discriminate against an employee" when:

> A.  The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the states of this State, a political subdivision of this State, or the United States;
>
> B.  The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in

---

[58]    "Although the MWPA itself provides no private right of action, complainants may, after appropriate administrative process, file a civil action under the MHRA." *Tripp v. Cole,* 425 F.3d 5, 9 n.4 (1st Cir. 2005) (internal citations omitted).

writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual. . . ."

26 M.R.S. § 833(1)(A)-(B). 42 U.S.C. § 2000e-3a prohibits employer retaliation when [an employee] has opposed . . . an unlawful discrimination practice . . . or . . . made a Title VII charge due to an individual opposing any act or practice that is unlawful under this Act." Similarly, section 4633 of the MHRA makes it unlawful for an employer to "discriminate against any individual because that individual has opposed any act or practice that is unlawful under this act . . . ."

To establish a claim of either general retaliation under Title VII/MHRA or specific retaliation under the MWPA, the Plaintiffs must make a prima facie case that (1) they engaged in protected conduct; (2) they suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *Valle-Arce 20 v. Puerto Rico Ports Auth.,* 651 F. 3d 190, 198 (1st Cir. 2011); *see also Tripp*, 425 F.3d at 9; *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 24, 28 A.3d 610. An employee's report "is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists." *Cormier v. Genesis Healthcare LLC,* 129 A.3d 944, 948 (Me. 2015). "Both general MHRA and WPA retaliation claims require but-for causation, meaning that the adverse action must have been substantially motivated by the employee's protected activity." *Charette v. St. John Valley Soil & Water Conservation Dist.,* No. 1:17-cv-35-GZS, 2018 WL 3966250, at *25, 2018 U.S. Dist. LEXIS 139547, at *72 (D. Me. Aug. 17, 2018) (citing *Theriault v. Genesis*

*Healthcare LLC,* 890 F.3d 342, 349 (1st Cir. 2018) (WPA)); *Ramsdell v. Huhtamaki, Inc.*, 992 F. Supp. 2d 1, 21 (D. Me. 2014) (MHRA)).

Whether the Plaintiffs have made a prima facie case of unlawful retaliation differs slightly for WPA claims. *Brady v. Cumberland Cty.,* 2015 ME 143, ¶ 16, 126 A.3d 1145, as corrected (Mar. 8, 2016). Rather than following the *McDonnell Douglas* burden-shifting framework traditionally used to analyze unlawful retaliation claims, the Maine Supreme Judicial Court collapsed the framework into one step. *Id.* at 1154-55. Described as the "Maine-specific retaliation paradigm," the First Circuit explained that "the Law Court shelved the tripartite *McDonnell Douglas* burden-shifting framework in favor of a singular inquiry: 'whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent.'" *Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 350 (1st Cir. 2018) (quoting *Brady*, 126 A.3d at 1158). In other words, the inquiry "includes consideration of whether an employer's purported non-retaliatory reason for its employment action is pretextual." *Theriault v. Genesis Healthcare LLC,* No. 2:15-CV-530-GZS, 2017 WL 1403162, at *7 (D. Me. Apr. 19, 2017) (citing *Brady*, 126 A.3d at 1156). Yet, as the First Circuit has written, "all roads lead to Rome," and the Maine-specific paradigm "obligates the plaintiff to adduce precisely the same quantum of proof that she would have had to adduce to defeat summary judgment under the *McDonnell Douglas* framework." *Theriault*, 890 F.3d at 351.

### 1.    The Plaintiffs' WPA Claim

The Plaintiffs allege in Count One of their Complaint that they were retaliated against for reporting what they believed was the unlawful Pega contract, and for refusing to carry out a directive to engage in activity that would be unlawful by exclusively using the contract "even when it was not the best product for their state agency customers." *Compl.* at 5, 9. The Defendant concedes that Ms. Cole's suspension and Ms. Gordon's termination are adverse employment actions for the purposes of the WPA analysis but contests that OIT's placement of Ms. Cole and Ms. Gordon on paid administrative leave pending the outcome of the investigation meets the threshold for an "adverse action" for the purpose of the WPA. *Def.'s Mot.* at 21. The Defendant also challenges that there was a causal connection between the activity and the subsequent adverse actions taken by OIT. *Id.* at 18.

The WPA "requires an employee to prove that a reasonable person might have believed that the employer was acting unlawfully." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154–55 (Me. 1991) (finding no reasonable cause to establish protected activity when an employee's testimony showed "no more than that he believed that a violation of contract provisions might have occurred"). The evidence in this record suggests that OIT entered into a sole source contract with Pega Enterprise in contravention of state of Maine policies. The Pega Enterprise contract was an $8 million dollar contract and the record indicates that a contract of this size should have been approved by the State Procurement Review Committee and reviewed by the state of Maine Attorney General's Office. PSAMF ¶¶ 156-61. In addition, the Plaintiffs reported to Ms. Beaudoin that "they were being pressured to 'push' the Pega

contract and sell licenses to agencies even if it did not feel like a good fit." PRDSMF ¶ 88.

Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable factfinder could find this evidence to be sufficient to support an objective or subjectively reasonable belief that unlawful activity had occurred. The focus of the protected activity inquiry, however, is not whether the contract was illegal, or whether other employees knew it was illegal, but whether the Plaintiffs had a reasonable belief that it was illegal. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261–62 (1st Cir. 1999). Here, the Court concludes that the Plaintiffs generated a jury question as to whether they engaged in protected conduct when they asserted that the Pega Enterprise contract was illegal. The unorthodox bidding process combined with agency pressure to use Pega Enterprise's product, even though the Plaintiffs thought the Pega product was not a good fit for the agency are sufficient to give the Plaintiffs a reasonable belief of impropriety.

The Defendant concedes that the Plaintiffs' suffered an adverse employment action when OIT suspended Ms. Cole and terminated Ms. Gordon, but contests that OIT's placement of the Plaintiffs on paid administrative leave constitutes an adverse action for the purposes of the causal connection analysis. *Def.'s Mot.* at 21 n.2. The Defendant argues that since the paid administrative leave was not an adverse action, the date that Mr. Karstens learned of the Plaintiffs' complaints to Human Resources is not material to the causal connection analysis. *Id.* This issue is a red herring.

Adverse actions under the WPA are those that adversely affect the employee's compensation, terms or other conditions of employment. *DiCentes v. Michaud*, 1998 ME 227, ¶ 21, 719 A.2d 509, 514. The Defendant contends that: "at the summary judgment phase, placement on paid administrative leave does not constitute an adverse action for purposes of a WPA claim." *Def.'s Mot.* at 21 (quoting *Testa v. Town of Madison*, 2005 WL 2365319, at *11 (D. Me. Sept. 26, 2005)). It is true that there is authority that the placement of an employee on paid administrative leave pending the results of an investigation does not constitute an adverse employment action. *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015); *Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005); *Peltier v. United States*, 388 F.3d 984, 986, 988 (6th Cir. 2004); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001); *Breaux v. City of Garland*, 205 F.3d 150, 154-55 (5th Cir. 2000). There is countervailing authority that placement on administrative leave may constitute an adverse employment action. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (en banc). The First Circuit has not directly addressed the issue.

In *United States ex rel. Herman v. Coloplast Corp.*, 295 F. Supp. 3d 37 (D. Mass. 2018), the District Court set forth a useful analysis. In *Herman*, after noting the divergence of Circuit authority and the absence of First Circuit precedent, the Court observed that in *Lockridge v. University of Maine System*, 597 F.3d 464, 472 (1st Cir. 2010), the First Circuit wrote that "employment actions are less susceptible to categorical treatment when it comes to the question of whether they are or are not

materially adverse." *Herman*, 295 F. Supp. 3d at 43. The *Herman* Court noted that "whether a challenged action is materially adverse is 'an objective test and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Lockridge*, 597 F.3d at 472 (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 71 (2006)).

The record reflects that Ms. Gordon and Ms. Cole complained directly to Mr. Karstens about the Pega Enterprise contract on November 10, 2015, and Ms. Gordon had raised the issue earlier. Ms. Gordon and Ms. Cole next raised the issue on February 22, 2016, when they spoke with Ms. Beaudoin. OIT began an investigation of Ms. Gordon and Ms. Cole's time sheets on the same day. Assuming that the placement of the Plaintiffs on paid administrative leave was not an adverse action, the record still shows that the investigation, which resulted in admitted adverse action by the Defendant against the Plaintiffs, was initiated the same day that they reported their concerns regarding the Pega Contract. Removing the paid administrative leave as an adverse action does not change the evidence in the record regarding timing and causation. The fact that the Defendant placed the Plaintiffs on paid administrative leave before it terminated one and suspended another is immaterial to their claims, which are based on undeniably adverse employment actions.

The Court turns to causation. The Maine Supreme Judicial Court has held that "[t]emporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie

case." *Fuhrmann v. Staples the Officer Superstore East, Inc.*, 2012 ME 135, ¶ 16, 58 A.3d 1091 (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 722). Here, if the date of the employer's awareness of protected activity (to someone in authority other than Mr. Karstens) is February 22, 2016, the employer initiated its investigation of their alleged misconduct the very same day. Although the timing between the protected conduct and the employer's action may be purely coincidental, the Court must view the facts in the light most favorable to the Plaintiffs and will not assume that the employer did not know of the protected conduct when it initiated and continued its investigation, leading to the suspension of one complainant and the termination of the other. At least, there is a question of fact on this issue that must be resolved by a jury. This is enough to meet the Plaintiffs' prima facie burden to demonstrate causation. Thus, in the Court's view, the Plaintiffs sustained their burden to meet the three elements for a WPA claim.

Included in the mix is the Defendant's justification for its disciplinary actions against Ms. Gordon and Ms. Cole. *See Brady*, 126 A.3d at 1158 ("[T]he evidence that would be presented in the second and third stages of the *McDonnell Douglas* framework will still fall within the analytical framework applicable to summary judgment motions in WPA retaliation cases because the evidence still bears on the allegation of causation"). Here, the question is whether the Defendant's justification overrides the temporal link between receipt of the Plaintiffs' concerns about Pega Enterprises and the initiation and maintenance of the investigation that led to their

discipline. The Court views the countervailing positions on this issue between the Plaintiffs and the Defendant as fodder for jury resolution.

The standard for a WPA claim in Maine is, as the First Circuit and the Maine Law Court have articulated it, "a singular inquiry: 'whether the record as a whole would allow a jury to reasonably conclude that the adverse employment was motivated at least in part by retaliatory intent." *Theriault v. Genesis Healthcare LLC*, 890 F.3d at 350 (quoting *Brady*, 126 A.3d at 1158). Applying this standard, the Court concludes that there is sufficient evidence for the Plaintiffs to survive summary judgment on their WPA claim.

## 2. The Plaintiffs' General Retaliation Claim under Title VII/MHRA

Count Two of the Plaintiffs' Complaint claims general discrimination under 42 U.S.C.A. § 20003 and 5 M.R.S. § 4663, based on Ms. Cole's and Ms. Gordon's allegation that they were retaliated against by their employer for reporting sexual harassment and a hostile work environment.

The analysis of a Title VII claim of retaliation largely mirrors that of a WPA claim with the same three elements of a prima facie case. *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003); *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003); *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994). As a matter of law, the Plaintiffs' retaliation claim may be viable even if their underlying discrimination claim is not. *Benoit*, 331 F.3d at 174; *Mesnick v. General Electric,* 950 F.2d 816, 827 (1st Cir. 1991); *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 33 (1st Cir. 1990). The employment activity or practice that the Plaintiffs opposed need

not be a Title VII violation as long as they had a reasonable belief that it was and they communicated that belief to their employer in good faith. *Benoit*, 331 F.3d at 174–75; *Higgins*, 194 F.3d at 262.

The Defendant argues that the "Plaintiffs cannot demonstrate that they had a good faith, reasonable belief that OIT engaged in employment practices made unlawful by [the] Maine Human Rights Act or Title VII . . . because no reasonable person could objectively believe that the conduct Plaintiffs' reported to Human Resources (1) occurred because of their status as women; or (2) was severe or pervasive enough to constitute sexual harassment under the MHRA or Title VII." *Def.'s Mot.* at 20.

The Court disagrees. The record confirms that the Plaintiffs had a good faith belief that Ms. Cole had been discriminated against and subjected to a hostile work environment by Mr. Karstens. In February 2016, Ms. Gordon reported Mr. Karstens' behavior to CIO Jim Smith, to HR Representative Ms. Sturtevant, and Ms. Cole and Ms. Gordon together reported this activity to HR Director Beaudoin on February 22, 2016.[59]

---

[59] Ms. Gordon contacted OIT's Chief Information Officer, Jim Smith, on February 10, 2016, and expressed concerns about Mr. Karstens becoming Ms. Cole's supervisor. At Mr. Smith's advice, Ms. Gordon reported her concerns the next day to Human Resources Representative Tammy Sturtevant, specifically reporting an incident that occurred between Ms. Cole and Mr. Karstens at a bar at an after-hours work function. Ms. Sturtevant recalls that Ms. Gordon had a very serious concern about the sexual gestures Mr. Karstens made toward Ms. Cole and their effect on the work environment.

The record reflects, and the Defendant does not contest, that OIT took "adverse employment action" against Ms. Cole and Ms. Gordon under Title VII. Under the Title VII analysis, the Plaintiffs need only show that the action taken "would have been materially adverse to a reasonable employee or applicant." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 54 (2006). As the Court has discussed, the actions of OIT—placing Ms. Cole and Ms. Gordon on paid administrative leave pending the outcome of the investigation, then subsequently terminating Ms. Gordon and suspending Ms. Cole—are adverse under Title VII.

The last element is a causal connection between the protected activity and the adverse action. The Defendant argues that the Plaintiffs have not established a causal connection because Ms. Perkins, who was unaware of the Plaintiffs' reports against Mr. Karstens, first noticed discrepancies on Ms. Cole's and Ms. Gordon's timesheets on February 22, 2016, which she brought to Mr. Karstens' attention, who brought the issues to Mr. Smith's attention that same morning. The Defendant contends that the "Plaintiffs cannot establish that they would not have been investigated and ultimately disciplined but for OIT's desire to retaliate against them for their reports to Human Resources." *Def.'s Mot.* at 25. In response, the Plaintiffs argue that "the temporal proximity between plaintiffs' reports to HT and Karstens' sudden 'investigation' is so close causation can be inferred." *Pls.' Resp.* at 8 (citing *Furhman v. Staples Office Superstore East, Inc.,* 58 A. 3d 1083, 1093 (Me. 2012)).

In *Mesnick v. General Electric Company*, the First Circuit elucidated on the types of evidence that can be sufficient for the purposes of summary judgment:

> There are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment . . . hurdle[]. These include . . . evidence of differential treatment in the workplace, temporal proximity of an employee's protected activity to an employer's adverse action, and comments by the employer which intimate a retaliatory mindset. Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable jury could infer that the employer retaliated against him for engaging in [] protected activity.

950 F.2d 816, 828 (1st Cir. 1991) (internal citations omitted). "Under clear First Circuit precedent, [] close temporal proximity can be sufficient to sustain the Plaintiff's *prima facie* burden in her retaliation claim." *Rhoades v. Camden Nat. Corp.,* 575 F. Supp. 2d 260, 262 (D. Me. 2008) (citing *Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003)). In *Rhoades,* the Court found a timeframe of twelve days between the Plaintiff's complaint and her termination to be "particularly compelling." *Id.*

Here, the temporal proximity between the protected activity and the adverse action is similarly persuasive. Ms. Gordon's first report of unlawful activity was on February 10, 2016. Ms. Cole and Ms. Gordon met with Ms. Beaudoin together on February 22, 2016. That same day, Ms. Perkins reported irregularities on Ms. Cole's and Ms. Gordon's timesheets to Mr. Karstens, who reported them the same day to Mr. Smith. The record also shows that Mr. Karstens provided a significant proportion of documents informing the investigation. It is true that Mr. Karstens was not aware of the allegations against him until February 24, 2016, two days after he reported the timesheet irregularities to Mr. Smith. But if—as the Plaintiffs allege—Mr. Karstens had been engaging in a campaign of sexual harassment against Ms. Cole, the fact

that he spent hours during the evenings of Monday, February 22, 2016 and Tuesday, February 23, 2016, poring over Ms. Cole's and Ms. Gordon's timesheets is consistent with his using the pretext of an investigation to continue to harass Ms. Cole and Ms. Gordon, Ms. Cole's supporter. Furthermore, whether Mr. Karstens continued to support the investigation against the Plaintiffs by providing evidence and documentation to Ms. Shippee after he learned of the Plaintiffs' allegations against him is disputed by the parties and is a question for a jury. The Court finds that a reasonable jury could determine the existence of a causal connection between the protected activity and the investigation and subsequent disciplinary action against the Plaintiffs.

Under the *McDonnell Douglas* burden-shifting framework, the Plaintiffs have sustained their burden to establish a prima facie case of retaliation. *McDonnell Douglas* requires that the burden then shifts to OIT to show a legitimate, non-discriminatory reason for its actions. According to the Defendant, the Court must look to "whether the employer believed that its profferred reason was credible," *Def.'s Reply* at 7 (citing *Ruiz v. Posadas de San Juan Assoc.,* 124 F.3d 243, 248 (1st Cir. 1997)), and the Plaintiffs "must do more than cast doubt on the rationale proffered by the employer." *Id.* The Defendant contends that "much more evidence beyond the documentation that Karstens provided was considered in substantiating the allegations against Plaintiffs. Ms. Shippee interviewed at least thirteen witnesses, in addition to Plaintiffs, and Plaintiffs were interviewed at least five times each." *Id.* The Court concludes that there are triable issues as to whether OIT's adverse actions

against Ms. Cole and Ms. Gordon were legitimate or whether Mr. Karstens' involvement in the investigation tainted its outcome. The Court, therefore, denies the Defendant's motion for summary judgment as to Plaintiffs' Title VII and MHRA general retaliation claims.

### D. Sex Discrimination under Title VII and the Maine Human Rights Act

In Count Two of their Complaint, the Plaintiffs allege that they were the victims of sex discrimination under Title VII and the MHRA under a disparate treatment theory.[60] Maine courts have used federal precedent surrounding Title VII for the purposes of construing and applying the provisions of the MHRA. *Bowen v. Dep't of Human Servs.,* 606 A.2d 1051, 1053 (Me. 1992). Accordingly, the Court will apply the same legal standard in considering whether the case survives summary judgment under both federal and state law. *See Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 436 n.3 (1st Cir. 1997). "Absent direct evidence of discrimination, a Title VII plaintiff must resort to the three-stage burden-shifting framework set forth in *McDonnell Douglas*." *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir. 1999). To establish a prima facie case of sex discrimination under a disparate treatment theory, the Plaintiffs must first show (1) that they were members of a protected class; (2) that they performed their job satisfactorily, (3) that they were subjected to an adverse employment action; and (4) that they were treated differently

---

[60]     The Plaintiffs' Complaint fails to identify the theory under which the Plaintiffs argue sex discrimination. The Defendant, however, puts forth a disparate treatment theory in its motion, and in their filings, the Plaintiffs do not refute this theory. For purposes of the motion for summary judgment, the Court assumes that the Plaintiffs are proceeding under this theory.

from similarly situated men. *Charette v. St. John Valley Soil & Water Conservation Dist.*, No. 1:17-CV-35-GZS, 2018 WL 3966250, at *20 (D. Me. Aug. 17, 2018); *McDonnell Douglas Corp.*, 411 U.S. at 802; *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001). A prima facie showing creates a presumption of discrimination, upon which the burden of production shifts to the Defendant to show a legitimate, nondiscriminatory reason for the adverse action. *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996). If the defendant is successful, the plaintiff must then show that defendant's reason is merely pretextual and that defendant intentionally discriminated against him or her. *Id.*

The Defendant argues that the Plaintiffs' prima facie case for gender discrimination fails because the Plaintiffs have not shown that they were not treated differently from similarly situated men. Accordingly, the Court narrows its inquiry to the issue raised by the Defendant.

The Plaintiffs contend that Ms. Cole was "denied equal opportunity to thrive at work because she didn't want a sexual relationship with Karstens." *Pls.' Resp.* at 4. However, the Plaintiffs have not offered evidence that similarly situated men were not or would not have been subjected to the adverse actions of OIT. The evidence most relevant to the issue is whether a male employee who was also allegedly using work time and other state resources for personal business was also placed under investigation. The male employee was not investigated, however, as he was no longer employed by the State when the alleged misconduct was discovered. These circumstances make the male employee an unhelpful comparator. Similarly,

although OIT considered taking action against the contract employees, both male and female, who were included in some of the meeting invitations for Ms. Cole's and Ms. Gordon's personal business venture, it was determined that they did not charge their time to OIT for these meetings, and no action was taken. Viewing the evidence in the light most favorable to the Plaintiffs, the record is insufficient for a reasonable factfinder to find for the Plaintiffs on their Title VII and MHRA discrimination claim, and the Court accordingly grants the Defendant's motion for summary judgment on this issue.

### E. Hostile Work Environment under Title VII and the Maine Human Rights Act

In Count Two of their Complaint, the Plaintiffs put forth a claim of "sex discrimination, harassment, and retaliation" under Title VII and the MHRA. *Compl.* at 10.[61] "The theory of "hostile work environment" is premised on the notion that a series of discriminatory events of "intimidation, ridicule, and insult" may foster an adverse employment action if the conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," even where none of the individual occurrences alone rise to the level of an adverse employment action. *Ricci v. Applebee's Ne., Inc.*, 301 F. Supp. 2d 51, 53 (D. Me. 2004) (citing *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 78 (1998)). The "accumulated effect of incidents" on the plaintiff can amount to a hostile work

---

[61] Although Count Two is not clearly divided into separate theories in the Complaint, the Plaintiffs appear to claim that the Defendant subjected them to a hostile work environment. The Court will, therefore, evaluate it as an independent claim.

environment over time. *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001).

Although there is no formula to determine whether a plaintiff has presented enough evidence that a hostile work environment exists under Title VII and the MHRA, the plaintiffs must first establish that they are members of a protected class, that they were subjected to unwelcome sexual harassment, and that the harassment was based upon sex. *O'Rourke*, 235 F.3d at 729. "The pattern of conduct complained of must be "characterized by intimidation, ridicule and insult, not just minor unpleasantness or criticism, (2) offensive to the complainant precisely because of his or her membership in a protected class, and (3) sufficiently burdensome to materially alter the conditions of the complainant's employment." *Ricci,* 301 F. Supp. 2d at 53 (citing *White v. New Hampshire Dep't of Corrections,* 221 F.3d 254, 259–60 (1st Cir. 2000)). The discriminatory harassment must be "severe or pervasive," based on the all the circumstances. These include "the frequency and severity of the discriminatory conduct, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with the employee's work performance, and the effect of the conduct on the employee's psychological well-being." *Che v. Mass. Bay Trans. Auth.,* 342 F.3d 31, 40 (1st Cir. Aug. 26, 2003). "Generally, "pervasiveness and severity are questions of fact." *Flood v. Bank of Am. Corp.,* 780 F.3d 1, 10 (1st Cir. 2015); therefore, "[a]s a general matter, these are questions best left for the jury." *Che,* 342 F.3d at 40.

It is undisputed that the Plaintiffs are members of a protected class and that

Ms. Cole considered Mr. Karstens' conduct unwelcome. The Defendant contests, however, that the harassment was based on sex. The Defendant also argues that the Plaintiffs failed to establish that the conduct was 'severe or pervasive' or 'subjectively or objectively offensive'. While the Court finds the evidence offered by the Plaintiffs on these issues underwhelming, it concludes that the determination of whether the behavior of Mr. Karstens' constituted a hostile work environment at OIT is "best left for the jury." *Id.* at 40. This evidence includes Mr. Karstens' prior instances of acting up, his anger and belligerence during office meetings, his refusal to make eye contact with Ms. Cole, his singling out Ms. Cole for "drilling," his warning to Ms. Cole about being too friendly with a contractor, his verbal warning to her about giving someone "attitude," and her inability to do anything right in his eyes. These cumulative facts and others convince the Court that the Plaintiffs have raised a proper question for jury resolution. Accordingly, the Court denies the Defendant's motion for summary judgment on the Plaintiffs' hostile work environment claim.

## VI.    CONCLUSION

The Court DENIES the Defendant's Motion for Summary Judgment (ECF No. 27) on Count I (Claim of Retaliation under the Maine Whistleblowers' Act), GRANTS in part and DENIES in part the Defendant's Motion for Summary Judgment on Count II. Specifically, the Court GRANTS the Defendant's Motion for Summary Judgment on the disparate treatment theory underlying Count II, but DENIES the general retaliation and hostile work environment theories underlying Count II.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 25th day of September, 2018